[No. A131729. First Dist., Div. Two. Mar. 14, 2012.]

In re ANDREW YOUNG on Habeas Corpus.

COUNSEL

Brad O'Connell and Brandie Devall, under appointments by the Court of Appeal, for Petitioner Andrew Young.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Julie A. Malone and Sara J. Romano, Deputy Attorneys General, for Respondent The People.

OPINION

LAMBDEN, J.—Petitioner Andrew Young seeks a writ of habeas corpus arising from his denial of parole by the Board of Parole Hearings (Board). The Board's decision was principally based on its conclusion that petitioner lacked insight into what the Board considered to be a particularly egregious crime and why he committed it.

The Board's decision must be vacated because it does not meet what our Supreme Court has repeatedly stated are two basic imperatives of due

process. As the court most recently discussed in *In re Shaputis* (2011) 53 Cal.4th 192 [134 Cal.Rptr.3d 86, 265 P.3d 253] (*Shaputis II*), the Board must, consistent with due process, answer the "essential question" of "whether the inmate currently poses a threat to public safety" by conducting "an individualized inquiry into the inmate's suitability for parole," "draw[ing] . . . answers from the entire record, including the facts of the offense, the inmate's progress during incarceration, and the insight he or she has achieved into past behavior." (*Id.* at pp. 220, 219, 221.) Under our highly deferential " 'some evidence' " standard of review, we do not reweigh the evidence. (*Id.* at p. 221.) Rather, we uphold the Board's interpretation of the evidence if it is "reasonable" in the sense that it meets two imperatives: it must reflect "due consideration" of the relevant statutory factors and, also, it must not be "arbitrary," meaning that its analysis must be supported by at least a "modicum of evidence, not mere guesswork." (*Id.* at pp. 212, 219, 221.)

The Board's decision does not reflect due consideration of several relevant statutory factors, particularly those regarding petitioner's taking responsibility for the commitment offense and remorse, insights, exemplary prison record, extensive rehabilitative programming, positive psychological evaluations, concrete parole plans, and significant support from family and friends. Furthermore, it is arbitrary. Rather than fulfill its duty to "take the record as it finds it" (*Shaputis II, supra,* 53 Cal.4th. at p. 212), the Board's reasons for parole denial rest largely on incorrect factual contentions and guesswork, and we have not found any evidence in the record supporting the Board's reasons that is rationally indicative of current dangerousness.

Therefore, we conclude that the Board's decision violates due process. We grant the petition and remand this matter to the Board for further proceedings pursuant to *In re Prather* (2010) 50 Cal.4th 238 [112 Cal.Rptr.3d 291, 234 P.3d 541] (*Prather*) to determine whether or not petitioner is suitable for parole, a question we do not address herein.

## BACKGROUND

Young, now 50 years old, was sentenced in 1993 to an indeterminate life term for the second degree murder of Dollie Harvey. According to our opinion in *People v. Young* (Aug. 9, 1994, A062097) (nonpub. opn.),[1] at trial petitioner admitted killing Harvey, with whom he had had a relationship for several years that was ending, but argued he did so in the heat of passion and was guilty of voluntary manslaughter. At his first trial, the jury found him not

---

[1] Neither party, nor the Board, has referred to our opinion and we do not know if it was in the record available to the Board. We take judicial notice of it pursuant to Evidence Code section 452, subdivision (a) to explain this background, but do not otherwise rely on it herein. (See *In re Luke L.* (1996) 44 Cal.App.4th 670, 674, fn. 3 [52 Cal.Rptr.2d 53].)

guilty of first degree murder, but could not reach a verdict on the lesser charges. Upon retrial, he was found guilty of second degree murder.

### The Account of the Crime Contained in the 1993 Probation Report

According to a 1993 probation report considered by the Board, on the evening of August 24, 1991,[2] petitioner's friend, David Balter, returned with his girlfriend to his apartment in Albany, California, to discover petitioner was in an upstairs bathroom with the door closed. When petitioner emerged, Balter realized he had tried to hurt himself, but petitioner would not respond to questions about himself or Harvey. Over the next few days, petitioner's "erratic conduct" and Harvey's apparent disappearance caused Balter to notify police. The police entered Harvey's apartment and discovered Harvey's body in the rear bedroom with a suitcase covering the head. There were several wounds on both the face and head. Balter directed the police to where petitioner was staying, but he was gone.

On Wednesday, August 28, Balter reported to police that he had talked to petitioner earlier that morning and petitioner told him he was considering suicide, stating, "I'm gonna end it all, it would be best for all of us." Petitioner told Balter he had killed Harvey, stating, "I didn't mean to do it. She hit me and I hit her back." He was arrested that afternoon without difficulty at a Berkeley hospital after Balter's girlfriend told police he was there.

Petitioner told police at the time of his arrest in 1991 that he met Harvey at a restaurant on August 23 and they went to her apartment to discuss their relationship. They argued there and Harvey told petitioner to leave. "[W]hen he failed to do so she grabbed a kitchen knife. She swung it at him and he struck her on the arm, forcing her to drop the knife. She ran to a nearby pantry type closet where she grabbed a hammer. She swung the hammer at him and he was able to disarm her. He then struck her several times with the hammer. She resisted and a fight ensued. He continued to strike her with the hammer and when she continued to resist he strangled her. He indicates she eventually stopped struggling. He stayed at her side for an unknown period of time. He then left the apartment . . . ." He said he threw the hammer and his bloody clothing into a dumpster.

---

[2] The probation officer reported this date as August 26. If the other dates in her report are correct, however, Balter encountered petitioner on Saturday night, August 24, 1991. We take judicial notice of the 1991 calendar pursuant to Evidence Code section 452, subdivision (h). (*Hospital Committee for Livermore-Pleasanton Areas v. City of Oakland* (2009) 176 Cal.App.4th 1360, 1362, fn. 1 [99 Cal.Rptr.3d 29].)

An autopsy of Harvey's body found 67 blunt force injuries and an abrasion on the neck. Forty-eight of the blunt force injuries were on the face and neck. The cause of death was strangulation and blunt force head injuries, as well as blood loss from those injuries.

Petitioner also made a statement for the 1993 probation report, in which he indicated that he had been engaged in a costly, emotional custody battle with the mother (not Harvey) of his son, whom petitioner had taken care of without her for several years, since the boy was two years old. The mother "kidnapped" the boy and took him back to New York. Eleven months later, after numerous trips to New York and a lot of time and money, petitioner lost primary custody. He had to leave his job for a higher paying one, was doing his best to fulfill all of his responsibilities, and felt pressured by his expenses, child support, work, and "the stress of just trying to deal with everything," which was "mounting."

Petitioner said he and Harvey began to argue and their relationship began to diminish. Harvey learned that petitioner had spanked her son and took the boy to live with his father in New York. She and petitioner decided to end their relationship, although they remained intimate and continued to care for each other. Harvey moved with petitioner's help to an apartment. Petitioner left his job and went to New York to visit his son for about a month. The day after he returned to California, he met Harvey when she got off work. He stated:

"We then went to the apartment, had a drink or two and sniffed some cocaine that she had. We were talking about money, the bills, the children and everything else that affected our relationship. The talking became arguing and yelling. . . . The yelling continued I guess [Harvey] became afraid and therefore defensive. She picked up a knife and we started fighting. I hit her and the knife dropped. She ran and picked up a hammer and we continued fighting. At some point in the fight I gained possession of the hammer. As a result of my actions, therefore, [Harvey] is [now] no longer here with us. In that short period of time I lost control of myself both emotionally and physically. I was later told by mental health experts that what happened was not from the result of any one event, but a reaction from an accumulation of events.

"While sitting, with [Harvey] all night, the realization of what happened and what I had done became apparent. I then tried to kill myself in a number of different ways. I was later arrested and jailed. I told the police and everyone else what happened, how, where and why."

### Petitioner's Prior History

Petitioner was born on August 16, 1961, in East Meadows, New York. He told the Board he remains in contact with his mother and father, who divorced when he was a child, and has four brothers and one sister, including one police officer, none of whom have a criminal history.

Petitioner graduated from a New York high school in 1979. He enlisted in the Marine Corps in 1980 and was honorably discharged in 1982. He met Harvey in New York in 1987. She moved to the Bay Area and he joined her in 1989, after which they lived together. He worked at a number of jobs between 1983 and 1991. Unemployed at the time of the murder, he had last worked at a wine and spirits company as a warehouseman for two years, and had previously been employed as a freelance legal assistant, at the Oakland Army Base, as a food company purveyor, and as a warehouseman.

Petitioner was convicted of petty larceny in 1979 and attempted possession of a weapon in 1984. He told the Board he was arrested in 1984 after he reached for a bag on the ground that, unknown to him, contained a gun. Although he said he had no juvenile record, the probation officer reported in 1993 that he pled guilty as a juvenile in 1979 to disorderly conduct and creating a dangerous act.

The probation officer reported that petitioner admitted "he used cocaine when he lost custody of his son," and "next" used it on the night he killed Harvey. Petitioner told the Board he only used cocaine once, at Harvey's instigation on the night he killed her, as "an appeasement." The probation officer reported that petitioner "does not believe cocaine had any influence in the occurrence of this offense." Petitioner told the psychologist evaluating him in 2008 that, although he does not "blame the drugs," "[t]hey helped me lose control and there is no excuse for what I did." He told the Board he did not seek help for Harvey after he attacked her "because of being inhibited by the alcohol and cocaine, and not thinking rationally."

The probation officer also reported in 1993 that petitioner said he was a minimal user of alcohol and a marijuana user since high school, and that he was charged with possession of a controlled substance when he was arrested in 1984, although he was convicted of attempted possession of a weapon only.

### Petitioner's Prison History

As of the 2009 Board hearing, petitioner's disciplinary record in prison was exemplary. He had not received any disciplinary writeups, and it is

undisputed that he had the lowest possible classification score, given the crime committed. He had above average work reports dating back to 2004, had completed training as a machinist, and was completing vocational training in mill and cabinet work. He tutored other inmates to help them obtain their GED's. In 2004, he sought out and urged prison officials to call an ambulance for an injured kitchen staff person and was credited with helping prevent her further injury.

Petitioner sought, and participated in, individual and group therapy concerning his anger issues from approximately 1999 to 2002. His statements to the Board and the record indicate that he regularly participated in Narcotics Anonymous (NA) or Alcoholics Anonymous (AA) from 2002 until December 2008, when he was transferred to another facility that did not have space for him in a program. He was able to meaningfully discuss various recovery steps for the Board. At the time of the hearing, he was participating in a multireligious-based group called Houses of Healing because AA and NA were not available to him.

Petitioner has participated in numerous self-help programs since 2005. He completed parenting and anger management independent study programs and a parenting program in 2005, completed a self-help program called "Ways to Happiness" in 2008, and was in the middle of a "Learning Skills for Life" program at the time of the hearing. He prepared several self-help journals, entitled "Thinking Errors," "Self-Worth," "Values for Responsibility," "Relationship Communication," "The Con Game," "My Change Plan," "Coping Skills," and "Anger Management."

### Petitioner's Parole Plans

Petitioner had multiple housing and employment offers in California and New York, including a full-time employment offer from a construction company with jobsites in the Sacramento area, where his brother would provide him housing. He also had a number of letters of support from family and friends. He stated that he planned to continue attending AA and NA meetings if released.

### Psychological Evaluations

Psychological evaluations of petitioner were all positive. In 2008, forensic psychologist Katherine Twohy administered three tests to estimate his risk of future violence. He scored lower than 99.3 percent of North American male offenders on the psychopathy checklist and lower than 97.7 percent of North American incarcerated male offenders for recidivism risk, and showed a low likelihood of becoming involved in a violent offense if released. Twohy

concluded that he demonstrated "at least average insight," did not have impulsivity issues, did not demonstrate cocaine abuse or dependence based on his report of his one-time use of it on the night of the crime, and presented a low risk of future violence.

In 2005, forensic psychologist Corinne Schroeder concluded that petitioner's risk of harm to others was below average for the parolee population. He had "programmed in an exemplary fashion," showed genuine remorse, and was "ready to go home at such time as the Board determines that he has sustained his gains long enough to be considered reliable and permanent."

In 2000, psychologist Louis Beermann noted that petitioner's judgment and insight appeared normal, and that he would not pose "more than a normal risk factor whether in or out of a controlled environment." Beermann stated that petitioner "would be an excellent candidate for parole."

In 1996, psychologist Robert Wagner reported that petitioner's history indicated symptoms of depression, that he was not presently suicidal, and that he had sought out counseling immediately after the crime and while in prison. Wagner estimated that petitioner's "potential for violence is less than average."

### *The 2009 Board Hearing*

At the 2009 Board hearing, the presiding commissioner began the Board's substantive inquiry by reading from "the most recent deputy counselor's report" summarizing the commitment offense and stating the "prisoner's version" of it, which appears to be an August 2009 "Life Prisoner Evaluation" that is contained in the record.[3]

The presiding commissioner then asked petitioner if he remembered the evening in question and how many times he recalled hitting Harvey with a

---

[3] The summary of the crime read into the record by the presiding commissioner was consistent with the information contained in the 1993 probation officer's report. The "prisoner's version" read into the record by the presiding commissioner was as follows: " 'The prisoner stated that on Friday evening, August 23, 1991, he and the victim had met at Denny's restaurant. He stated they drove to [Harvey's] apartment to discuss their relationship. Subsequently, the discussion grew into an argument, which became violent after Harvey told Young to leave. Young stated that when he did not leave Harvey picked up a kitchen knife and slashed at him. After he disarmed her she ran to a nearby pantry type closet where she retrieved a hammer. She swung the hammer at him several times. He stated that she continued to attack him even after he had taken the hammer from her. He stated that when his attempts to subdue her failed he struck her with a hammer and strangled her. He states that he does not understand his actions. Young accepts responsibility for Harvey's death and expressed remorse for his actions.' "

hammer. Petitioner said he recalled that evening and hitting Harvey "a total of six or seven times, but after reading the autopsy and the reports that were filed, I accept that fact that it was much more." He did not recall strangling Harvey. He recalled that they drank and "had cocaine" a half-hour to an hour before he killed her.

Asked why he did not just leave, petitioner said, "That's a question that I continually ask myself." Asked what answers he had found, petitioner said that he "lost control," "allowed the anger to basically rule my normal, natural emotions," and with "everything that was going on, I just kept going and couldn't stop." He said, "The total accumulation of factors in my life at that time, every day that I had suppressed and that I had no outlets. I never sought help, and at that time I didn't think I needed help. And over the years these are things that I've been dealing with as far as finding out why—why I basically lost control that day, because in my entire life I have no violence issues." He also said, "[T]he main problem started shortly after my son was taken away from me. He was taken without my knowledge, without her knowledge. So, I would call it kidnapping. And then we went through a custody dispute, flying back and forth to New York, then started working different jobs to pay the bills, and that's when all the difficulties started happening."

Petitioner said that on the night he killed Harvey, they argued about "the finances, me spanking her son, and just the deterioration of my character in general." Prodded by the presiding commissioner, he agreed that Harvey wanted to "split up at that point" and petitioner did not want to, which was also "at the core of the argument" that night, and that it was "a part of me not accepting or respecting what she was saying." The presiding commissioner also asked if, on the day he killed Harvey, petitioner had any injuries other than those he inflicted on himself; petitioner said he did not believe so.

The remainder of the Board's questions focused on petitioner's prison record, prior history, rehabilitative programming, psychological evaluations, and possible parole plans, most of which we have already summarized, as well as on the letters of support from family and friends and his religious faith. A deputy district attorney urged the Board to deny parole, as did Harvey's daughter, and petitioner's attorney argued that it should be granted.

In his closing statement, petitioner said, "I sincerely apologize for the unfortunate circumstances that bring us here today. And we are here because I killed Ms. Harvey. No one deserves to live their last moments as Dollie did. I am truly sorry and ashamed for her suffering and the pain that her family and loved ones have had to endure." He also said, "I alone, am responsible for my thoughts, actions, and decisions, and as I reflect I can see that my anger and

selfishness for [*sic*] the reasons behind these actions." He extended his "deepest and sincerest regards and apologies to Dollie and her loved ones," and said, "[t]he sincere regret and the remorse that is in my heart drives me to make amends whenever and wherever possible."

### The Board's Denial of Parole

The presiding commissioner announced the Board's decision to deny parole at the end of the hearing. Its primary reason for doing so was petitioner's lack of insight about a particularly egregious murder, both regarding what occurred and why he committed it. The Board also found evidence for certain unsuitability factors based on petitioner's "tumultuous" relationships and the egregious nature of the crime.

The presiding commissioner complimented petitioner on "coming a long ways," citing his efforts to acquire a vocation in mill and cabinet work. He said petitioner's "prior criminality" "was not that extensive" and that he was working in a "good job" at the time of the murder, but the Board was puzzled about the positive psychological evaluations because of its "deep questions" about petitioner's lack of understanding about the crime. The Board set petitioner's next parole hearing three years away.

The Contra Costa County Superior Court denied petitioner's petition for a writ of habeas corpus, ruling that the Board's decision was supported by some evidence of current dangerousness. Upon receiving the petition, we issued an order to show cause to the Director of the Department of Corrections and Rehabilitation and the Attorney General filed a return on behalf of respondent, Gary Swarthout, warden at California State Prison, Solano. The parties also submitted supplemental briefing regarding the significance of *Shaputis II* in response to our order.

### DISCUSSION

The Board's analysis does not reflect due consideration of all the relevant suitability factors and evidence, and rests largely on incorrect factual contentions and guesswork. In our own review of the entire record, we have not found a modicum of evidence supporting the Board's analysis that is rationally indicative of current dangerousness. Therefore, its decision must be vacated.

### I. General Legal Standards

*Shaputis II, supra*, 53 Cal.4th 192 is the most recent of several opinions by our Supreme Court that together explain the framework that exists among our

three branches of government regarding parole decisions. (See *Prather, supra,* 50 Cal.4th 238; *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*); *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis I*); *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783] (*Dannenberg*); *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).) As they explain, the Board's parole authority is governed by a body of statutes and regulations as mandated by the Legislature, most notably Penal Code section 3041 (section 3041) and title 15, section 2402 of the California Code of Regulations.[4] (*Shaputis II*, at p. 209, fn. 5; *Prather*, at pp. 249–251; *Lawrence*, at pp. 1201–1203.)[5]

■ Section 3041 mandates that the Board " ' "normally" ' " set a parole date for an eligible inmate, and " 'must' " do so unless it determines that an inmate poses a current threat to public safety. (*Prather, supra,* 50 Cal.4th at p. 249, quoting *Lawrence, supra,* 44 Cal.4th at p. 1202.)[6] As a result, parole applicants have a "due process liberty interest in parole" and " 'an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation.' " (*Lawrence, supra,* 44 Cal.4th at pp. 1191, 1204.) In other words, " 'parole is the rule, rather than the exception' " (*id.* at p. 1204, quoting *In re Smith* (2003) 114 Cal.App.4th 343, 366 [7 Cal.Rptr.3d 655]), and "the onus [is] on the Board to justify denial of parole . . ." (*Shaputis II, supra,* 53 Cal.4th at p. 222 (conc. opn. of Liu, J.)).

---

[4] We refer to the California Code of Regulations as "Regulations." All further references to the Regulations are to title 15, unless otherwise specified.

[5] Footnote 1 of the dissent states that, although our Supreme Court did not say so directly in *Shaputis II*, "the relevant universe has changed considerably since the issuance of [*Lawrence*]." (Dis. opn., *post*, at p. 320, fn. 1.) This suggestion is puzzling in light of the unanimous court's firm embrace of *Lawrence* and *Rosenkrantz*, in *Shaputis II*. The *Shaputis II* court states in the first paragraph of its opinion that it was reaffirming the "deferential character of the 'some evidence' standard," which, the court states, "we articulated in [*Rosenkrantz*] and refined in [*Lawrence*]." (*Shaputis II, supra,* 53 Cal.4th at pp. 198–199.) The court cites *Lawrence* over two dozen times in the *Shaputis II* opinion and cites *Rosenkrantz* numerous times as well. In other words, the court indicated in *Shaputis II* that we remain very much in a universe defined by *Lawrence*, as well as *Rosenkrantz*.

[6] Specifically, pursuant to section 3041, subdivision (a), " 'the Board "*shall normally* set a parole release date" one year prior to the inmate's minimum eligible parole release date, and shall set the date "in a manner that will provide uniform terms for offenses of similar gravity and magnitude *in respect to their threat to the public* . . . ." ' " (*Prather, supra,* 50 Cal.4th at p. 249, first italics added.) Pursuant to section 3041, subdivision (b), the Board " 'must' " set a release date unless it " ' "determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that *consideration of the public safety* requires a more lengthy period of incarceration for this individual." ' " (*Prather*, at p. 249, quoting *Lawrence, supra,* 44 Cal.4th at pp. 1201–1202, italics added.)

■ Accordingly, as we have discussed, the Board must determine, consistent with due process, the "essential question" of "whether the inmate currently poses a threat to public safety." (*Shaputis II, supra,* 53 Cal.4th at pp. 209, 220.) The Board answers this question by conducting "an individualized inquiry" into the inmate's suitability for parole (*id.* at p. 219), "draw[ing] . . . answers from the *entire* record, including the facts of the offense, the inmate's progress during incarceration, and the insight he or she has achieved into past behavior." (*Id.* at p. 221, italics added.) It is required to give due consideration to the criteria referred to in section 3041 and, more specifically, in Regulations section 2402, promulgated by the Board pursuant to legislative mandate.[7] (*Prather, supra,* 50 Cal.4th at p. 251 [Board "*must* consider the statutory factors concerning parole suitability set forth in section 3041 as well as the Board regulations" (italics added)].)

Regulations section 2402 contains numerous factors regarding both an inmate's suitability[8] and unsuitability[9] for parole that the Board must consider and rely on to assess whether the inmate poses "an unreasonable risk of danger to society if released from prison." (Regs., § 2402, subds. (a), (c), (d).) These "matrix of factors . . . contemplates that even those who committed aggravated murder may be paroled after serving a sufficiently long term if the Board determines that evidence of postconviction rehabilitation indicates they no longer pose a threat to public safety." (*Lawrence, supra,* 44 Cal.4th at p. 1211.)

We review the Board's decision under a "highly deferential 'some evidence' standard." (*Shaputis II, supra,* 53 Cal.4th at p. 221.)[10] The *Shaputis II* opinion states that the Board's decision "is upheld unless it is arbitrary or

---

[7] Section 3041, subdivision (a) provides, "The [B]oard shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the inmate was sentenced and other factors in mitigation or aggravation of the crime."

[8] Suitability factors are the absence of a juvenile record; "reasonably stable relationships with others"; signs of remorse; a crime committed "as the result of significant stress in [the prisoner's] life"; battered woman syndrome; the lack of "any significant history of violent crime"; the prisoner's age reduces the probability of recidivism; realistic plans for release or marketable skills that can be put to use upon release; and institutional activities that "indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d)(1)–(9).)

[9] Unsuitability factors are a commitment offense carried out in an "especially heinous, atrocious or cruel manner," including because there were "[m]ultiple victims," the offense was carried out in a "dispassionate and calculated manner," the victim was "abused, defiled or mutilated," the offense was carried out "in a manner [demonstrating] an exceptionally callous disregard for human suffering," or the motive for the crime was "inexplicable or very trivial in relation to the offense." (Regs., § 2402, subd. (c)(1)(A)–(E).) Other unsuitability factors are a previous history of violence; "a history of unstable or tumultuous relationships with others"; sadistic sexual offenses; "a lengthy history of severe mental problems related to the offense"; and "serious misconduct in prison or jail." (Regs., § 2402, subd. (c)(2)–(6).)

[10] Petitioner both acknowledges the "some evidence" test applies to his case and argues that federal constitutional law requires that we apply a "preponderance of the evidence" test to our

procedurally flawed." (53 Cal.4th at p. 221.) It does not specifically define what is meant by "procedurally flawed." Elsewhere, however, it states that "[u]nder the 'some evidence' standard of review, the parole authority's interpretation of the evidence must be upheld if it is reasonable, in the sense that it is not arbitrary, and reflects due consideration of the relevant factors." (*Id.* at p. 212.)[11]

■ More specifically, although " '[t]he precise manner in which the specified factors relevant to parole suitability are considered and balanced' " lies with the Board (*Shaputis II, supra*, 53 Cal.4th at p. 210, quoting *Rosenkrantz, supra*, 29 Cal.4th at p. 677), its decision " '*must reflect an individualized consideration of the specified criteria* . . . .' " (*Lawrence, supra*, 44 Cal.4th at p. 1232, quoting *Rosenkrantz*, at p. 677, italics added.)[12] "It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; *the significant circumstance is how those factors interrelate* to support a conclusion of *current* dangerousness to the public." (*Lawrence*, at p. 1212, italics added.) The Board "must determine whether a particular fact is probative of the central issue of current dangerousness when considered in light of the *full* record." (*Prather, supra*, 50 Cal.4th at p. 255, italics added.)

" 'As long as the . . . decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the . . . decision.' " (*Shaputis II, supra*, 53 Cal.4th at p. 210, quoting *Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

review of the Board's decision. We apply the "some evidence" test because petitioner seeks a writ of habeas corpus for violation of a liberty interest in parole created by state law. (*Lawrence, supra*, 44 Cal.4th at p. 1191; *Prather, supra*, 50 Cal.4th at p. 252; *Swarthout v. Cooke* (2011) 562 U.S. ___, ___–___ [178 L.Ed.2d 732, 131 S.Ct. 859, 861–863].)

[11] The *Shaputis II* court cites *Lawrence* and *Shaputis I* as authority for its conclusion that under the "some evidence" standard of review, we must consider not only if the Board's interpretation of the evidence is reasonable, but also that it "reflects due consideration of the relevant factors." (*Shaputis II, supra*, 53 Cal.4th at p. 212.) This confirms the analytical framework articulated in *Lawrence*.

Our recognition of this "due consideration" imperative is perhaps the most significant difference between our view and our colleague's dissent, which does not expressly refer to the "due consideration" required by the Supreme Court's analytical framework. The dissent does refer to *Shaputis II*'s instruction that we uphold the Board's decision unless it is " 'arbitrary or procedurally flawed' " (dis. opn., *post*, at p. 320), but the dissent does not discuss the meaning of "procedurally flawed." The dissent's reference to the term highlights the potential confusion engendered by the solitary and undefined use of the term "procedurally flawed" at the end of the *Shaputis II* opinion, which appears to refer to, but in no way excuses the Board from, the "due consideration" requirement that is embraced throughout the *Shaputis II* opinion.

[12] The *Rosenkrantz* court discussed this individual consideration in the context of a Governor's parole decision, but indicated that the Governor and the Board are subject to the same standard of judicial review. (*Rosenkrantz, supra*, 29 Cal.4th at p. 626.)

We are to ensure that the Board's "analysis of the public safety risk entailed in a grant of parole is based on a modicum of evidence, not mere guesswork." (*Shaputis II*, at p. 219.) We review not only the evidence specified by the Board, but the entire record to determine whether this modicum of evidence exists,[13] and look for "a rational nexus between the evidence and the ultimate determination of current dangerousness." (*Shaputis II*, at p. 221.) We do not reweigh the evidence. (*Ibid.*)

■ Thus, *Shaputis II* and the Supreme Court opinions upon which it relies make clear that we are to review the Board's decision to ensure that it satisfies two due process imperatives that are particularly relevant to this case. We must determine whether the Board's decision reflects due consideration of all relevant statutory factors and, if it does, whether its analysis is supported by a modicum of evidence in the record, not mere guesswork, that is rationally indicative of current dangerousness.

If the Board's consideration of the specified factors is not supported by some evidence in the record, we must grant the petition and order the Board to vacate its petition. (*Rosenkrantz, supra*, 29 Cal.4th at p. 658.) In such a case, we "generally should direct the Board to conduct a new parole-suitability hearing in accordance with due process of law and consistent with the decision of the court, and should not place improper limitations on the type of evidence the Board is statutorily obligated to consider." (*Prather, supra*, 50 Cal.4th at p. 244.)

## II. *Lack of Due Consideration*

The Board violated due process in this case because it considered only some of the relevant statutory factors in making its decision. (*Shaputis II, supra*, 53 Cal.4th at pp. 212, 221; *Prather, supra*, 50 Cal.4th at pp. 251, 255; *Lawrence, supra*, 44 Cal.4th at pp. 1212, 1213, 1219.)

As petitioner points out, the presiding commissioner's statement of the Board's decision indicates that the Board ignored numerous suitability factors and evidence that were directly relevant to an evaluation of his current dangerousness. As we will discuss, the presiding commissioner also made incorrect factual contentions, thereby further indicating that the Board did not consider actual evidence that was relevant to its analysis.

---

[13] Nonetheless, as Justice Liu points out in his concurrence in *Shaputis II*, we "examine[] the *rationality* of the parole authority's decision, an inquiry that properly focuses on the authority's reasoning, including the evidence cited by the authority in support of its reasoning." (*Shaputis II, supra*, 53 Cal.4th at p. 225 (conc. opn. of Liu, J.).)

The Board ignored a number of relevant statutory factors, including those related to petitioner's insights, postconviction rehabilitation efforts, and positive evaluations although these "must, by statute, be considered and relied upon by . . . the Board . . . ." (*Lawrence, supra*, 44 Cal.4th at p. 1213.) The Board disregarded petitioner's repeated expressions of responsibility and remorse regarding the commitment offense[14] (Regs., § 2402, subd. (d)(3)) and his explanation that he was subject to very stressful circumstances at the time he committed the crime due to the long and costly custody battle he lost over his son (Regs., § 2402, subd. (d)(4) [regarding significant stress]). It paid no attention to his exemplary prison record and extensive rehabilitative programming (Regs., § 2402, subd. (d)(9) [regarding institutional activities indicating an enhanced ability to function within the law upon release]). It ignored his concrete parole plans (Regs., § 2402, subd. (d)(8) [realistic plans for release]) and significant support from family and friends (Regs., § 2402, subd. (d)(2) [regarding reasonably stable relationships with others]).[15] As we will discuss, the Board also did not consider petitioner's stated insights into why he committed the crime, incorrectly asserting that he had no insights and wrongly concluding that it could, therefore, disregard the positive psychological evaluations.

Respondent contends the presiding commissioner's statement that petitioner had "come a long ways" demonstrates the Board considered all positive suitability factors. The record does not support this contention. The presiding commissioner followed this statement with a reference to petitioner's vocational training only, indicating his reference was limited to that, and focused his remarks almost entirely on petitioner's purported lack of insight for a particularly egregious crime. The only other suitability factor he referred to was petitioner's minimal prior criminal history (which respondent unpersuasively argues was a reference to *unsuitability* for parole).[16]

As a result of the Board's failure to duly consider all relevant statutory factors, its stated concerns, while they often track the unsuitability factors

---

[14] The presiding commissioner only said at the end of the hearing that the Board "appreciated" petitioner's "effort to make amends to the family" via the district attorney.

[15] Petitioner also cites as a neglected suitability factor that he was 48 years old at the time of the hearing, 18 years older than when he committed the crime. We are not aware, however, of case law indicating that such an age establishes suitability for parole, and petitioner does not cite any, referring only to a Ninth Circuit case that acknowledges the general proposition that "[a] state may act on the view that age diminishes a prisoner's inclination to harm others, or that it diminishes only his ability to run fast after he does." (*Hayward v. Marshal* (9th Cir. 2010) 603 F.3d 546, 563.)

[16] The presiding commissioner also incorrectly said petitioner was working at a "good job" at the time he killed Harvey, which was not supported by evidence; the record actually indicates that petitioner was unemployed, having left his last job to return to New York in June 1991.

stated in Regulations section 2402, subdivision (c), amount to a rote recitation of these factors " 'without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude.' " (*Shaputis I, supra*, 44 Cal.4th at pp. 1254–1255.) As respondent points out, "we are not required to remand due solely to the absence of some pro forma recitation on the record. To the contrary, *Lawrence* called, instead, for reasoning." (*In re Criscione* (2009) 180 Cal.App.4th 1446, 1461 [103 Cal.Rptr.3d 549].) However, as we will discuss, the application of reasoned analysis is not apparent from the reasons given by the Board for denying parole.

### III. *The Board's Specific Reasons for Denying Parole*

■ The Board's reasons for denying parole reflect a lack of due consideration of all relevant statutory factors, and they are based on flawed logic. With the exception of facts that support a part of its analysis about the egregious nature of the crime (which alone are not rationally indicative of current dangerousness), the Board arbitrarily relied on incorrect factual contentions and its own guesswork. As petitioner points out, " '[s]omewhere along the evidentiary spectrum, a rational inference loses its character if one or more of the premises upon which it rests, fails. When this happens, the inference becomes irrational speculation.' " (*In re Loresch* (2010) 183 Cal.App.4th 150, 164 [107 Cal.Rptr.3d 331] [vacating the Governor's reversal of a Board grant of parole because his hypothetical scenarios of the future, based on feeble rationale, were not some evidence of current dangerousness].) This occurred repeatedly here, as we now discuss.

### A. *Lack of Insight*

The Board's principal basis for denying parole was its conclusion that petitioner lacked insight because he recalled nothing about the crime and did not have any insight into why he committed it, and, furthermore, because he asserted that Harvey assaulted him with a knife and hammer just before he killed her. Each of these reasons was based on a consideration of only some of the relevant statutory factors and arbitrary analyses.

■ As our Supreme Court clarified in *Shaputis II*, "[c]onsideration of an inmate's degree of insight is well within the scope of the parole regulations. The regulations do not use the term 'insight,' but they direct the Board to consider the inmate's 'past and present attitude toward the crime' (Regs., § 2402, subd. (b)), and 'the presence of remorse,' expressly including indications that the inmate 'understands the nature and magnitude of the offense' (Regs., § 2402, subd. (d)(3)). These factors fit comfortably within the descriptive category of 'insight.' " (*Shaputis II, supra*, 53 Cal.4th at p. 218.)

Accordingly, "[T]he presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety." (*Ibid.*)

### 1. *Petitioner's Lack of Recall About Commitment Offense*

The Board reasoned that petitioner lacked insight into the commitment offense because he recalled "nothing" about committing it, which the Board deemed to be "extraordinarily unusual." This analysis incorrectly assumed petitioner had no recollection, included guesswork, and did not reflect a consideration of petitioner's lack of recall in the context of all relevant suitability factors.

The presiding commissioner commented on petitioner's lack of memory about the commitment offense by stating that it was "extraordinarily unusual" that he "virtually [did not] recall at all" assaulting Harvey, given that he struck Harvey with "many" blows and strangled her. The presiding commissioner stated, "you recall that you had coke and alcohol, as you report, prior to this event. *You recall her attacking you, but from that point on nothing.* We're going to encourage you to think more about that, pray more about that, deal with that, because it's not that we want anyone to grovel over what they did. Goodness knows, people that are on that side of the table have done horrible things. It's that we want you to come to grips with it, speak of it. Not necessarily to us, but certainly to an AA sponsor or your . . . or whomever you confide in so that you can get to the core issues there." (Italics added.)

The Board's analysis was arbitrary for two reasons. First, its conclusion that petitioner recalled *nothing* about committing the crime is not supported by the evidence. Petitioner said he did not recall strangling Harvey. However, when asked at the hearing if he recalled only striking Harvey one time with a hammer, petitioner indicated this was not correct and stated, "At the time that I got arrested I believed that it was a total of six or seven times, but after reading the autopsy and the reports that were filed, I accept that fact that it was much more." Also, Twohy reported in her 2008 evaluation that he said, "At the time I thought I hit her about six times. I know now that I hit her much more than that." In other words, the record indicates petitioner *did* recall repeatedly striking Harvey with a hammer, evidence which the Board inexplicably disregarded.[17]

---

[17] Among the evidence cited in the dissent as support for the Board's "lack of insight" conclusion is Young's inability to recall strangling Harvey or the name the Board used to describe the item he used to strangle her: "ligature." (Dis. opn., *post*, at p. 322.) However, the dissent does not address our conclusion that the Board incorrectly asserted as a basis for its decision that Young recalled *nothing* about committing the crime, indicating it did

Second, the Board's analysis relies on guesswork. The presiding commissioner did not refer to any evidence, and we have found none in the record (such as an assessment by an evaluating psychologist), that supports his statement that it was "extraordinarily unusual" for a person to have no recollection of the crime in these circumstances, or that, as he implied, such a lack of recall impaired petitioner's insight in a way that was rationally indicative of current dangerousness. Nor have we found any evidence supporting the Board's apparent view that petitioner *could* recall more about what happened by "thinking" and "praying" more about it. Neither proposition is self-evident. The Board simply speculated about what people should and can recall when they commit extraordinarily violent acts. It cannot rely on such guesswork. (*Shaputis II, supra,* 53 Cal.4th at p. 219; *Lawrence, supra,* 44 Cal.4th at p. 1213.)

The Board's analysis also indicates it did not consider the significance of petitioner's purportedly total lack of recall in the context of all relevant statutory factors and evidence.[18] The circumstances of this case are similar to those we reviewed in *In re Juarez* (2010) 182 Cal.App.4th 1316 [106 Cal.Rptr.3d 648]. Juarez was convicted of second degree murder for driving at excessive speeds away from police while impaired by PCP and other substances so as to lose control of his car and collide with another vehicle. (*Id.* at pp. 1321–1322.) At his parole hearing, Juarez did not remember the details of the commitment offense, but had for some time fully accepted responsibility for it, did not dispute his commission of the offenses, recalled knowingly driving his car after smoking a marijuana cigarette containing PCP, and expressed remorse for killing the victim. (*Id.* at pp. 1320, 1328.) He was a model prisoner, an ongoing participant in AA and a past participant in NA, acknowledged that he was an alcoholic and drug addict, and pledged to continue attending AA meetings after his release. (*Id.* at p. 1320.) The Board denied him parole, relying significantly on his " 'credibility' " because of his claims that he passed out while driving at the time of the commitment offense. (*Ibid.*) We determined that Juarez's failure to recall the details of his

not consider the recollections he did have, nor does the dissent explain why Young's lack of recollection is rationally indicative of current dangerousness in light of all the relevant statutory factors and evidence. This is one example of the analytical difference between us. The dissent suggests the reviewing court's role is limited to searching the record for some evidence to support the Board's decision. In our view, *Shaputis II* and the preceding Supreme Court cases cited herein indicate that under our "some evidence" standard of review, we must determine whether the Board's reasons for denial are supported by evidence and reflect due consideration of all the relevant factors and the entire record.

[18] The Board did not discuss why it concluded that petitioner's purportedly total lack of recall regarding his commission of the crime was rationally indicative of current dangerousness. Nonetheless, we examine the Board's reasoning rather than rely on the lack of "pro forma recitation" on the record. (*In re Criscione, supra,* 180 Cal.App.4th at p. 1461.)

commitment offense had no bearing on his current dangerousness because he took responsibility for both the crime and his substance abuse problems. (*Id.* at pp. 1338–1341.)

Similarly, petitioner's statements and conduct in prison demonstrate that he has taken full responsibility for killing Harvey and steps to prevent its reoccurrence, none of which was considered by the Board. Petitioner's statements at the hearing indicate he recalled striking Harvey repeatedly and accepted that he struck her 67 times and strangled her. He took full responsibility and expressed remorse for committing the crime, relevant to the remorse suitability factor. (Regs., § 2402, subd. (d)(3).) He expressed insights into why he committed the crime, was found by Twohy to have "at least average insight," and received consistently positive psychological evaluations indicating he presented a low risk of violence if released. He engaged in extensive rehabilitative programming, which indicated he made efforts to change behaviors related to the crime, such as his participation in NA, AA, and anger management programs, and his prison conduct, concrete parole plans, and stable relationships were evidence supporting other suitability factors that we have discussed in part II. (*ante*, at pp. 304–306). In light of this evidence and the related statutory factors, the Board's factually flawed analysis of petitioner's purportedly total lack of recall certainly is not supported by a modicum of evidence that is rationally indicative of current dangerousness.[19]

### 2. *Petitioner's Lack of Insight into Why He Committed the Crime*

The Board also denied parole because petitioner purportedly did not have any insight into why he committed the crime. Once more, the Board's reasoning was premised on factual contentions that were not supported by evidence and demonstrated that it did not consider all the relevant statutory factors and evidence.

The presiding commissioner stated that the Board was denying parole because of the "void" in petitioner's recollection regarding what "led [him] off the end of the table as [he] did." The presiding commissioner told petitioner, "You remember it, I think, and that will never go away. And until

---

[19] It is conceivable that an inmate's claimed lack of memory about a commitment offense could show a material lack of insight, for example because his or her claim is implausible in light of the evidence. (See *Shaputis II, supra,* 53 Cal.4th at p. 216 [noting that, although a Board cannot insist that an inmate admit guilt for the commitment offense, "an *implausible* denial of guilt may support a finding of current dangerousness . . . . In such a case it is not the failure to admit guilt that reflects a lack of insight, but the fact that the denial is factually unsupported or otherwise lacking in credibility."].) However, the Board did not indicate that petitioner's lack of recall was implausible, only that it was "unusual" and that the Board believed he could recall more.

you deal with that, this will always be something inside of you that may come up again." He "did not know what set [petitioner] off" and said that the crime left the Board "with a question, why? You're the answer to that. You're the one that can get to it, and we encourage you to do that because it's going to come up each and every time." He further stated, "We'd like you to do more insightful work in terms of your insight into the crime and your insight into the causative factors of this crime. That may come as a result of a one on one personal interaction with . . . whomever you have confidence in that you can sit down and go through this process. Not one that will allow you to just shrug it off by saying I don't remember. I think you need to remember."

Respondent argues that the Board's decision "found that [petitioner's] various accounts as to why he murdered the victim did not reflect a genuine understanding as to what caused his extremely violent outburst." We disagree. The presiding commissioner indicated that petitioner did not "remember" at all why he killed Harvey. This badly misconstrues, and fails to take into account, all of the relevant evidence and statutory factors.

As we have discussed, petitioner told the Board that, "with everything that was going on, I just kept going and couldn't stop" attacking Harvey. He said this was "[t]he total accumulation of factors in my life at that time, every day that I had suppressed and that I had no outlets. I never sought help, and at that time I didn't think I needed help. And over the years these are things that I've been dealing with as far as finding out why—why I basically lost control that day, because in my entire life I have no violence issues." The "main problem," petitioner continued, started shortly after his son was taken away from him and brought back to New York, which led to a custody dispute, travel back and forth to New York, financial issues, and difficulties between him and Harvey. He said he argued with Harvey the night that he killed her about "the finances, me spanking her son, and just the deterioration of my character in general." After prodding by the presiding commissioner, petitioner agreed that also "at the core of the argument" that night was the fact that Harvey wanted to "split up" and petitioner "didn't want to." According to petitioner, that was "a part of me not accepting or respecting what she was saying."

Similarly, Twohy reported in her 2008 psychological evaluation that petitioner said he had internalized a lot of sadness and anger stemming from the emotional custody battle over, and eventual loss of, his son. He realized that he was "much more angry" than he allowed himself to recognize at the time. She concluded, among other things, that petitioner showed "at least average insight" and a low risk of future violence.

The Board ignored all of this evidence of petitioner's insights. This is obvious from the Board's conclusion that he did not have *any* insights: one

cannot reach this conclusion after reviewing this evidence. Furthermore, if petitioner's insights are believed, and nothing in the record or stated by the Board provides any reason to disbelieve them, they are evidence in support of a mitigation suitability factor (Regs., § 2402, subd. (d)(4) [crime committed because of significant stress, particularly if built up over a long time]) and the statutory factors related to insight referred to in *Shaputis II, supra,* 53 Cal.4th at page 218, all of which the Board disregarded, just as it disregarded the other evidence and suitability factors we have referred to in part II. (*ante,* at pp. 304–306).[20]

Respondent contends the Board's decision was supported by sufficient evidence because petitioner "admitted" that he did not "understand" why he did what he did, citing the sentence contained in the "prisoner's version" of the crime that the presiding commissioner recited at the Board hearing ("[petitioner] states that he does not understand his actions"), which appears to have been taken from the 2009 life prisoner evaluation.[21] Quoting from the superior court's denial of petitioner's petition, respondent further argues that part of petitioner's explanation for why he killed Harvey, that he lost control and allowed his anger to rule, " 'amounts to little more than stating the obvious.' " Respondent asserts that "it takes no great leap of logic to conclude that an inmate who has committed an extraordinarily violent murder and still does not know why he was unable to refrain from committing the murder, or exactly why he committed the murder, is currently dangerous."

---

[20] The dissent "could not disagree more" with our conclusion that the Board ignored the evidence of petitioner's insights. The dissent contends the Board "clearly did . . . weigh or balance" Young's stated insights about why he committed the crime "with what he *could not or would not say* on those subjects," and asserts that we have improperly reweighed the evidence of Young's insights because we have found substantial evidence that Young now has insight. (Dis. opn., *post,* at p. 324.) This assertion misses the point that we have stated no opinion on whether Young's stated insights are sufficient or not. Rather than show it weighed or balanced Young's stated insights, the Board's decision affirmatively shows it disregarded them. Contrary to the dissent's contention that we have reweighed the evidence, we refer to evidence ignored by the Board in order to point out its conclusion that Young had *no* insights is not supported by evidence and shows it did not give due consideration to all relevant statutory factors and evidence. As a result, the Board's decision does not address the question of whether Young's stated insights are sufficient or not.

[21] Although it is not material to our analysis herein, we note that it is unclear whether the "prisoner's version" of the crime contained in the 2009 life prisoner evaluation was stated by petitioner at that time or taken from a previous evaluation. An essentially identical "prisoner's version" of the crime is contained in the 2000 life prisoner evaluation. A 2005 life prisoner evaluation states that "[petitioner] reread his version of events from the last BPT report and stated that he had nothing to add or change." There is no such statement contained in the 2009 life prisoner evaluation. It only states on the last page that it is based on interviews with petitioner *and* a review of his central file, but does not indicate which information was taken from which source.

Respondent also argues that, "while an inmate may accept legal accountability and may be genuinely sorry, that inmate may still lack the required . . . understanding or insight sufficient for release on parole."

These contentions and arguments are unpersuasive because they ignore petitioner's further insights into why he killed Harvey and his taking full responsibility for doing so, and that the Board considered none of this in concluding that he lacked any insight into why he committed the crime. Again, the Board "*must* determine whether a particular fact is probative of the central issue of current dangerousness when considered in light of the *full* record." (*Prather, supra*, 50 Cal.4th at p. 255, italics added.) Thus, assuming the ambiguous sentence from the 2009 life prisoner evaluation recited by the presiding commissioner at the Board hearing was intended to report that petitioner stated that he had no insights into why he committed the crime, a questionable proposition, it did not relieve the Board of the responsibility to also consider the relevant insights petitioner *did* state both before and after this report was prepared (for example, as reported by Twohy and stated at the Board hearing), and all relevant statutory factors. The Board's conclusion that petitioner did not have *any* insights into why he committed the crime does not reflect this requisite due consideration and, given that it is not supported by the evidence, it is arbitrary, meaning that it is not supported by a modicum of evidence that is rationally indicative of current dangerousness. Therefore, the Board's reliance on this conclusion to deny petitioner parole violated due process. (*Shaputis II, supra*, 53 Cal.4th at pp. 212, 221.)

■ The Board also dismissed without good reason the psychological evaluations that petitioner presented a low risk of violence if released, although it was required to consider these evaluations. (*Lawrence, supra*, 44 Cal.4th at p. 1213.) The Board dismissed these assessments of low risk, finding this "puzzling . . . because we do find without an understanding of the life crime and what caused it, it leaves us with some deep questions." This dismissal was arbitrary because it was based on a false premise: petitioner *did* offer an understanding of why he committed the crime that the Board did not consider. "In cases where psychological evaluations consistently indicate that an inmate poses a low risk of danger to society, a contrary conclusion must be based on more than a hunch or mere belief that he should gain more insight into his past behavior. The Board must point to evidence from which it is reasonable to infer that the inmate's lack of insight reveals a danger undetected or underestimated in the psychological reports." (*Shaputis II, supra*, 53 Cal.4th at p. 228 (conc. opn. of Liu, J.), citing *In re Roderick* (2007) 154 Cal.App.4th 242, 271–272 [65 Cal.Rptr.3d 16].) The Board did not point to such evidence here.

The Board's "lack of insight" analysis was based on another contention that also was unsupported by evidence. The presiding commissioner stated

that petitioner had made statements at the hearing that were different from what he told his friend Balter in a phone call the day before petitioner's arrest in 1991, "[s]o, we would like to see you do some work on what actually happened, what caused it to go so horribly wrong." The presiding commissioner appears to have concluded that petitioner told Balter in 1991 that he had planned to kill himself before he killed Harvey, a misconstruction of the evidence, in this case the 1993 probation report. The presiding commissioner referred to page 7 of the report for his description of petitioner's "initial comment" to Balter "that you were going to end your life and this all started. You killed her, that is Ms. Harvey, and she hit me and I hit her back is what the comments are. . . ." The presiding commissioner appears to be referring to the report's description of a phone call between petitioner and Balter several days *after* the murder, in which petitioner reportedly told Balter that he was *then* contemplating suicide. We have found no evidence in the record that petitioner told anyone that he contemplated suicide before killing Harvey.

Finally, the Board relied on guesswork. The presiding commissioner referred to petitioner's ingestion of cocaine and alcohol on the night of the murder. He stated, "You had a couple of narcotics, alcohol and cocaine, that normally don't cause this kind of reaction, unlike angel dust or something like that where that's not what you had on board by your own admission." Without any evidentiary support, this is nothing more than improper speculation about what narcotics do and do not "normally" "cause this kind of reaction." (See *Lawrence, supra*, 44 Cal.4th at p. 1213.)

### 3. *The Board's Questions About Petitioner's Account of Harvey's Actions*

The Board also raised questions about petitioner's account that he assaulted Harvey after she "attacked" him with a knife and hammer. This analysis also is arbitrary and does not reflect a consideration of all relevant statutory factors.

The presiding commissioner stated to petitioner that "your commentary is that you and Ms. Harvey got into a discussion that ended up in an argument which gave rise to an assault, that's your description . . . was she essentially attacked you first and there doesn't seem to be any evidence that supports that. We weren't there. That's your part of the story. Typically when there is an attack of a knife and/or a hammer there is some defensive wounds. . . . We didn't see that here today." The presiding commissioner told petitioner that "those are questions that I hope you look into, pray about and work more on."

Despite the Board's reliance on this analysis, none of the commissioners asked petitioner to describe what Harvey did with the knife and hammer.

Instead, after reading into the record the "prisoner's version" of the crime, apparently from the 2009 life prisoner evaluation, the presiding commissioner merely asked petitioner, "Do you remember that evening, sir?" He also asked whether petitioner had suffered any injuries that day other than those he inflicted on himself. The presiding commissioner did not refer to any other accounts given by petitioner over the years regarding Harvey's actions.[22]

Respondent argues that we cannot disturb the Board's questions about the credibility of petitioner's account of Harvey's actions. However, the presiding commissioner's comments indicate that the Board questioned the accuracy of petitioner's account (or other accounts, to the extent considered), but not because it believed petitioner was lying; the presiding commissioner's instruction that petitioner pray and work on the Board's questions indicated the belief that this would lead to a change in these accounts.[23] Instead, the Board relied on its view that there was no evidence that Harvey assaulted him with a knife and hammer, specifically because of the lack of physical evidence of any defensive wounds on petitioner, which "typically occurred."

■ The Board's reliance on the absence of such physical evidence was improper. While, as respondent points out, the Board can properly "decline[] to give credence to certain evidence," such as petitioner's past account, it cannot do so if its reasoning "lacks any rational basis and is merely arbitrary." (*Shaputis II, supra*, 53 Cal.4th at p. 215.) Its determination was arbitrary here because it relied entirely on the speculation that "defensive wounds" "[t]ypically" occurred in such attacks. The presiding commissioner did not cite any factual basis for this conclusion, we have found none in our review of the entire record, and it is not self-evident. To the contrary, we fail to see how one can generalize about such events when particular circumstances can vary greatly. It is exactly the kind of guesswork that is prohibited. (*Id.* at p. 219; *Lawrence, supra*, 44 Cal.4th at p. 1213.)

The Board did not explain why any of petitioner's accounts of Harvey's actions were rationally indicative of current dangerousness in light of all relevant statutory factors and the entire record. We conclude that they are not. Indeed, the Board's reliance on its "absence of physical evidence" analysis under the circumstances is even more egregious than what was discussed in two similar cases, *In re Moses* (2010) 182 Cal.App.4th 1279 [106 Cal.Rptr.3d 608] (*Moses*) and *In re Palermo* (2009) 171 Cal.App.4th 1096 [90 Cal.Rptr.3d 101] (*Palermo*). In *Moses*, the Governor denied parole in part because he found, based on evidence in the record, that Moses acted with premeditation

---

[22] In other accounts, petitioner similarly indicated that, while Harvey picked up or swung a knife and a hammer at him, she did not strike him with either.

[23] Indeed, the Board would have been hard pressed to evaluate petitioner's credibility without asking him any questions at the hearing about Harvey's assault.

to kill his victim, although Moses's account indicated that he acted without premeditation. (*Moses*, at pp. 1288–1289.) We found the Governor's analysis flawed because he did not give due consideration to all relevant statutory factors and relied on the contention that Moses claimed self-defense, which was not supported by evidence. (*Id.* at p. 1309.) We further determined that any discrepancy between Moses's recall and the evidence was not rationally indicative of current dangerousness in light of Moses's acknowledgment that he murdered the victim, repeated expressions of remorse, participation in self-help programs in prison, exemplary disciplinary and work record in prison, and multiple positive psychological evaluations. (*Id.* at p. 1310.)

Similarly, in *Palermo*, the Third Appellate District granted relief to a habeas corpus petitioner who challenged the Board's denial of parole because the petitioner had continued to insist that he had "accidentally" shot his girlfriend with his gun. (*Palermo, supra*, 171 Cal.App.4th at pp. 1110–1111.) The appellate court concluded that "defendant's version of the shooting of the victim was not physically impossible and did not strain credulity such that his denial of an intentional killing was delusional, dishonest, or irrational. And . . . defendant accepted 'full responsibility' for his crime and expressed complete remorse; he participated effectively in rehabilitative programs while in prison; and the psychologists who evaluated him opined that he did not represent a risk of danger to the public if released on parole. Under these circumstances, his continuing insistence that the killing was the unintentional result of his foolish conduct (a claim which is not necessarily inconsistent with the evidence) does *not* support the Board's finding that he remains a danger to public safety." (*Id.* at p. 1112.)

Here, as we have discussed, the Board did not consider all relevant statutory factors and evidence. Similar to Moses and Palermo, petitioner took full responsibility and repeatedly expressed remorse for his commission of the commitment offense. Twohy reported in her 2008 psychological evaluation that petitioner told her that "he felt sad and was deeply ashamed of what he had done and that his crime was entirely his fault." He did not mitigate his responsibility based on Harvey's actions, nor rely on them to explain his violence. Nothing about his accounts strains credulity; to the contrary, there is no evidence suggesting anything else occurred. He *did* discuss his insights into why he committed the crime, received uniformly positive psychological evaluations, had an exemplary prison record, engaged in extensive rehabilitative programming efforts, and met our suitability factors. In light of this evidence and the related statutory factors, the Board's questions, flawed as they are by their reliance on guesswork, certainly are not supported by a modicum of evidence that is rationally indicative of current dangerousness.

B. *Tumultuous Relationships*

The Board also denied parole because it found petitioner had a history of tumultuous relationships. (See Regs., § 2402, subd. (c)(2) [indicating such relationships are indicative of an unstable social history].) The Board's analysis again was arbitrary and failed to take into account all relevant statutory factors and the entire record.

The presiding commissioner indicated that the Board denied parole in part because petitioner's "relationships were tumultuous. A splitting up of your ex-wife or girlfriend with a child, and somebody hijacking the child back to New York, I mean, that's not the kind of thing normal people engage in. And your efforts to retrieve your son or—were all indicative of, you know, something was amiss, you know, at that time."

■ The Board's analysis was arbitrary because, rather than consider petitioner's "history" of "relationships," it considered only one, with Johnson (the mother of his son), and only as it existed almost 20 years before the hearing. Separating from a girlfriend with whom one has had a child is not by itself a "history of tumultuous relationships." The presiding commissioner also referred to the hijacking of petitioner's son as "not the kind of thing normal people engage in." This is faulty reasoning because Johnson, not petitioner, engaged in this behavior. The presiding commissioner further said that petitioner's efforts to regain custody of his son indicated something was "amiss"; to the contrary, it suggests a commendably strong bond between father and son.

The record does not contain evidence of a history of tumultuous relationships. To the contrary, the Board disregarded that petitioner has significant support for his parole from family and friends, including letters written by both Johnson and petitioner's son. This is material evidence supporting a relevant suitability factor that the Board ignored (Regs., § 2402, subd. (d)(2) [regarding reasonably stable relationships with others]), along with its disregard of the other relevant suitability factors and facts. Once more, the Board did not consider all relevant statutory factors and evidence.

C. *The Egregious Nature of the Commitment Offense*

Finally, in light of the Board's failure to give due consideration to all relevant statutory factors and the arbitrary nature of its conclusions, it could not rely on the egregious nature of the commitment offense to deny petitioner parole.

■ The presiding commissioner, after referring to the commitment offense, stated that it was "a baseline" and that "it's how you deal with it,

how you grow from that that we look at." As a general matter, the presiding commissioner's statement was correct; that is, the egregious nature of the crime does not provide evidence of current dangerousness *unless* the record also establishes that the nature of the commitment offense remains probative of the conclusion that the inmate is a continuing threat to public safety. (*Lawrence, supra,* 44 Cal.4th at p. 1214.) The relevant inquiry is "whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude." (*Id.* at p. 1221.)

However, the presiding commissioner's analysis indicates the Board did not consider the egregiousness of the commitment offense in light of all of the relevant statutory factors or the entire record. Instead, the presiding commissioner merely stated several Board findings that were relevant to determining that the crime was committed in an "especially heinous, atrocious or cruel manner." (Regs., § 2402, subd. (c)(1)(A).) This was improper.

 Furthermore, some of the Board's findings about the egregious nature of the crime are not supported by evidence. Specifically, the presiding commissioner stated that the crime "was carried out dispassionately." (See Regs., § 2402, subd. (c)(1)(B).) Petitioner contends in his traverse that the "crime was arguably dispassionate—although, in all earnestness—the facts dictate that the victim was murdered in the throngs [*sic*] of passion, after the two had an argument." We do not find any evidence to support the Board's "dispassionate" conclusion in light of the evidence, such as the 67 blows from a blunt instrument found on Harvey's body, petitioner's own account of the escalating argument that preceded the murder, and his suicidal tendencies in the days immediately afterwards. Also, as we indicated in *Moses, supra,* 182 Cal.App.4th 1279, the second degree murder jury verdict further undermines such a "dispassionate" finding because a second degree murder is defined " ' "as the unlawful killing of a human being with malice aforethought, but without the additional elements—i.e., willfulness, premeditation, and deliberation—that would support a conviction of first degree murder." ' " (*Id.* at p. 1302 [rejecting a similar contention by the Governor].)

The Board also erred when it found that there were "multiple victims," a circumstance that is also relevant to determining that the crime was committed in an "especially heinous, atrocious or cruel manner." (Regs., § 2402, subd. (c)(1)(A).) The presiding commissioner based this finding on the impact of the crime on the children of the victim and petitioner's family. However,

the relevant regulation refers to "[m]ultiple victims . . . *attacked, injured or killed* in the same or separate incidents." (Regs., § 2402, subd. (c)(1)(A), italics added.) Harvey was the only such victim referred to by the Board. Its finding of multiple victims was not supported by any evidence.

■ The presiding commissioner also stated Board findings regarding the egregious nature of the crime that *were* supported by the evidence. He stated that Harvey was abused and that petitioner carried out the murder in a manner that demonstrated disregard for Harvey's suffering, which circumstances also support the conclusion the crime was committed in an "especially heinous, atrocious or cruel manner." (Regs., § 2402, subds. (c)(1)(C), (D).) The very violent nature of the crime supports these findings. However, the Board did not explain why they were probative of current dangerousness in light of all relevant statutory factors and the entire record. As our Supreme Court stated in *Lawrence*, "In some cases . . . in which evidence of the inmate's rehabilitation and suitability for parole under the governing statutes and regulations is overwhelming, the only evidence related to unsuitability is the gravity of the commitment offense, and that offense is both temporally remote and mitigated by circumstances indicating the conduct is unlikely to recur, the immutable circumstance that the commitment offense involved aggravated conduct does not provide 'some evidence' *inevitably* supporting the ultimate decision that the inmate remains a threat to public safety." (*Lawrence, supra*, 44 Cal.4th at p. 1191.) Based on our review of the entire record, we conclude this is such a case as well.

■ Respondent argues that "the circumstances of [petitioner's] crime, coupled with his current mental state, constitute some evidence supporting the Board's decision denying [petitioner] parole." As respondent correctly points out, "In some cases, such as those in which the inmate has failed to make efforts toward rehabilitation, has continued to engage in criminal conduct postincarceration, or has shown a lack of insight or remorse, the aggravated circumstances of the commitment offense may well continue to provide 'some evidence' of current dangerousness even decades after commission of the offense." (*Lawrence, supra*, 44 Cal.4th at p. 1228; see *Shaputis I, supra*, 44 Cal.4th at p. 1260.) However, the Board's concerns about petitioner's lack of insight and tumultuous relationships were improper grounds for the denial of parole, as we have discussed. The only Board findings supported by some evidence concerned the egregious nature of the crime. As indicated in *Lawrence*, "the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public

safety." (*Lawrence, supra*, 44 Cal.4th at p. 1214.) In other words, the Board's proper findings regarding the egregious nature of the crime are not alone rationally indicative of current dangerousness.

██ In short, for each reason stated by the Board, we conclude that, given the Board's arbitrary analysis and inadequate consideration of the relevant statutory factors, and based on our review of the entire record, the reason is not supported by a modicum of evidence that is rationally indicative of current dangerousness. Therefore, the Board improperly relied on each and all of these reasons to deny parole. Its decision must be vacated.

### IV. *Application of Marsy's Law*

Petitioner argues that the Board's application of Proposition 9 (Marsy's Law) at the 2009 hearing to set his next parole hearing three years away violated his state and federal constitutional rights. Respondent disagrees. We have no need to address these issues because we grant the petition.

### DISPOSITION

The petition for writ of habeas corpus is granted and this matter remanded to the Board with orders to vacate its previous decision and conduct a new parole-suitability hearing for petitioner consistent with this opinion and *Prather, supra*, 50 Cal.4th 238.

Kline, P. J., concurred.

**HAERLE, J.,** Dissenting.—I respectfully dissent. I believe that the majority's opinion (1) substantially ignores the standard of review that we are required to give to decisions of the Board of Parole Hearings (Board) under our Supreme Court's most recent, and clearly now controlling, decision of *In re Shaputis* (2011) 53 Cal.4th 192 [134 Cal.Rptr.3d 86, 265 P.3d 253] (*Shaputis II*) and (2) also either ignores or discards the several other factors (i.e., the factors in addition to the conceded "egregious nature" of the offense) (see maj. opn., *ante*, at pp. 317–319) which clearly establish there was and is "some evidence" supporting the Board's decision regarding the petitioner's lack of suitability for parole, particularly his current "lack of insight" (see *Shaputis II*, at pp. 217–220).

First of all, in concluding its unanimous decision in *Shaputis II*, our Supreme Court listed five factors governing review by the judicial branch of Board decisions regarding suitability for parole. (*Shaputis II, supra*, 53 Cal.4th at pp. 220–221.) In the interest of brevity, I will not quote them all but, first

of all, observe that its second point related to the Board's decision regarding "the insight [the inmate] has achieved into past behavior." (*Id.* at p. 221.)

The court then concluded with these two governing principles:

"4. Judicial review is conducted under the highly deferential 'some evidence' standard. The executive decision of the Board or the Governor is upheld unless it is arbitrary or procedurally flawed. The court reviews the entire record to determine whether a *modicum of evidence* supports the parole suitability decision.

"5. The reviewing court does not ask whether the inmate is currently dangerous. *That question is reserved for the executive branch.* Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness. *The court is not empowered to reweigh the evidence.*" (*Shaputis II, supra,* 53 Cal.4th at p. 221, italics added.)

As one of our sister courts has recently stated regarding the now controlling decision in *Shaputis II*: "Under the 'some evidence' standard, only a modicum of evidence is required to uphold a decision regarding suitability for parole. ([*Shaputis II, supra,*] 53 Cal.4th 192 . . . ; *In re Rosenkrantz* [(2002)] 29 Cal.4th [616,] 677 [128 Cal.Rptr.2d 104, 59 P.3d 174].) It is not for the reviewing court to decide *which* evidence in the record is convincing. (*Shaputis II,* at p. 211.) While the standard is not 'toothless' and ' "must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights" [citation], it must not operate so as to "impermissibly shift the ultimate discretionary decision of parole suitability from the executive branch to the judicial branch" [citation].' (*Id.* at p. 215.) Thus, when the parole authority declines to give credence to certain evidence, a reviewing court may not interfere unless that determination lacks any rational basis and is merely arbitrary. (*Ibid.*)" (*In re Mims* (2012) 203 Cal.App.4th 478, 486 (*Mims*).)[1]

I respectfully submit that there was, indeed, a "modicum of evidence" supporting the Board's decision, evidence based on inmate Andrew Young's testimony and his prior statements to the prison authorities. And, although ignored by the majority, the trial court here concluded likewise. That court (the Honorable Brian Haynes) wrote in its September 22, 2010, decision

---

[1] Although the *Mims* court did not say so directly (nor did our Supreme Court in *Shaputis II*), I suggest that the relevant universe has changed considerably since the issuance of *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535]. For example, compare the dissent of Justice Chin in that case (see *id.* at pp. 1230–1237 (dis. opn. of Chin, J.))—a dissent joined in by Justice Corrigan, the author of *Shaputis II*—with Justice Chin's concurring opinion in the latter case (*Shaputis II, supra,* 53 Cal.4th at p. 221 (conc. opn. of Chin, J.)).

denying Young's petition for a writ of habeas corpus: "The Board's findings are supported by the evidence. [¶] As the Board found, the commitment offense was carried out with extraordinary violence. Young hit Doll[ie] Harvey with a hammer 67 times. Young used a ligature to strangle Doll[ie] Harvey. Doll[ie] Harvey died from both the blood loss due to the head wounds she suffered from being hit with a hammer numerous times, and from the strangulation. [¶] On August 28, 2009, Young told Correctional Counselor D. Rowlett that he does not understand his actions. [¶] Young also testified that he still struggles to understand why he did not just leave when Harvey asked him to. As yet, he has come up with the explanation that he lost control and allowed anger to rule his normal, natural emotions. [¶] This testimony supports the Board's findings along the lines that Young has very little understanding of why he did what he did. Young's 'explanation' for swinging a hammer at Doll[ie] Harvey 67 times and strangling her with a ligature—that he lost control and allowed his anger to rule—amounts to little more than stating the obvious. [¶] Referring to the stress of losing custody of his son, Young attempted to explain the strangulation. Young testified that, 'with everything that was going on, I just kept going and couldn't stop.' [¶] While Young was unquestionably distraught over losing custody of his son, his testimony that this loss rendered him unable to stop the strangulation once it began could have contributed to the Board's fundamental concern that Young did not know why the crime happened. [¶] The Board was entitled to be particularly cautious when assessing an inmate who committed an extraordinarily violent murder because the inmate could control neither his anger nor his actions. [¶] It takes no great leap of logic to conclude that an inmate who has committed an extraordinarily violent murder and still does not know why he was unable to refrain from committing the murder, or exactly why he committed the murder, is currently dangerous. . . . [¶] Because the Board reasonably concluded that Young does not know why he committed the murder, and because the murder was extraordinarily violent, there is some evidence that Young would currently pose a risk of danger to public safety if released from prison."

I agree with Judge Haynes. First of all, and as the majority concedes—albeit toward the end of its decision—Young's murder of his former girlfriend, Dollie Harvey, in August 1991 was, indeed, an egregious offense. The majority notes that such a finding was made by the Board and that it was supported by "some evidence." (Maj. opn., *ante*, at p. 318.) As indeed it was.

According to the undisputed record, after the couple left a restaurant and went to her apartment, they argued, Harvey told Young to leave, he refused to do so, they argued more, she grabbed a knife, swung it at him, he forced her to drop the knife, she then grabbed a hammer, swung it at him, whereupon he was able to disarm her and secure the hammer himself. Whereupon Young beat her with the hammer 67 times, 48 of which blows were to her face or

neck, and then strangled her with a ligature, causing her death. He then, apparently, put a suitcase over her head. After that, he left her apartment and went to a friend's apartment, where he stayed several days, but without telling his friend what had happened. The police found the victim's body only because the friend suspected, from Young's "erratic conduct," that something might have happened to her. (See maj. opn., *ante*, at p. 294, and references therein.)

Based on that undisputed evidence, there can and will be no dispute between the majority and me regarding the "egregious nature" of the offense. But what I dispute is the majority's rejection of the proposition that there is no other "modicum of evidence" supporting the Board's decision regarding the nonsuitability of parole for Young. I respectfully suggest that, the majority to the contrary, there are several factors, and that they clearly support the Board's finding of Young's current "lack of insight" as to his actions in first beating and then strangling his former girlfriend.

First of all, because the precise cause of Harvey's death was recorded as strangulation, the Board's presiding officer made several inquiries of Young on that subject:

"[Q.] . . . Did you strangle her face to face? Were you looking at her when she died?

"[A.] *That's a part that I don't remember.*

"[Q.] Did you use your hands?

"[A.] *No. I believe they said it was a lig, something.*

"[Q.] Ligature?

"[A.] Yes.

"[Q.] But do you remember what you did?

"[A.] *The strangulation, I don't remember that.* I believe I got lost in—lost in the—I lost control." (Italics added.)

I submit that Young's current—and apparently ongoing—"lack of insight" is supported, indeed substantially, by the facts that 18 years after he beat and strangled his former girlfriend, he did not recall either (1) whether he was looking at her when he strangled her or (2) the name of the item (a "ligature,"

meaning a "thread, wire or cord") he used to strangle her, (3) nor, apparently, what sort of "ligature" he had used.

Second, I also suggest Young's ongoing lack of insight is supported by his (almost immediately ensuing) testimony that it had never crossed his mind "to call for some help" regarding his now dead (with a suitcase over her head) ex-girlfriend.

Third, the transcript of the hearing before the Board suggests rather strongly that Young lacked insight as to the reasons triggering his 67-blow assault and subsequent strangulation of Harvey. At one point, in answering a question as to why he and Harvey were "having difficulty that day," Young explained that their "main problem" was that, "a year and a half before this happened," his son's mother had been given custody of that boy in New York City. But, immediately after identifying that as the "main problem," Young could not explain to the Board how that "spill[ed] over into being a problem with Ms. Harvey."

Fourth, two months before the Board's October 2009 hearing, Young was interviewed not once but twice by Board personnel. Those personnel prepared a summary of their findings, which the Board had before it at the hearing. Among those findings was this key one: "He stated that when his attempts to subdue [Harvey] failed, he struck her with the hammer and strangled her. *He states he does not understand his actions.*" (Italics added.)

Fifth and finally regarding Young's lack of insight, after he had testified at the Board hearing that he had consumed some alcohol and cocaine shortly before the (soon to be fatal) argument with Harvey, the Board's chair asked him: "But if this is the way it happened, why didn't you just get the heck out?" Young replied: "That's a question that I continually ask myself." I suggest that this, again, is a reflection—one of many—of Young's lack of insight as of 2009 regarding the causes of his 67 hammer blows to and strangulation of his former girlfriend 18 years earlier.

As Judge Haynes noted in his summary of his reasons for denying the writ petition in his court, one of the two bases for the Board's denial of Young's parole was because of his "current mental state, including the Board's findings that Young did not have adequate recollection of what led him to commit the crime, that there was a void of some kind." Based on the factors noted above, I agree that there apparently still is a "void" in Young's appreciation of what happened in 1991, and that this void constitutes, or at the minimum is related to, a "lack of insight."

In *Shaputis II,* our Supreme Court explicitly noted, toward the start of its discussion of "*The Insight Factor,*" that recently "a great many parole denials

have focused on the inmate's lack of insight" and that this factor has been noted by many recent Court of Appeal decisions. (*Shaputis II, supra,* 53 Cal.4th at p. 217.) And the court clearly thought that was appropriate, stating that its prior decisions "have expressly recognized that the presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety. [Citations.]" (*Id.* at p. 218.) Then the court added: "[I]t is noteworthy that lack of insight pertains to the inmate's current state of mind, unlike the circumstances of the commitment offense . . . . Therefore, the most recent evidence of the inmate's degree of insight will usually bear most closely on the parole determination . . . ." (*Id.* at pp. 219–220, citation omitted.)

As the Attorney General's Office noted in its post-*Shaputis II* supplemental brief to us: "[H]ere, because the Board reasonably concluded that Young does not understand, and has seemingly not fully explored, why he murdered the victim, a conclusion supported by Young's admissions, and because the murder was extraordinary violent, there is some evidence that Young poses a current risk of danger to the public if released from prison."

The majority rejects this "current lack of insight" contention in its opinion. It argues that "the Board's reasoning was premised on factual contentions that were not supported by evidence and demonstrated that it did not consider all the relevant statutory factors and evidence." (Maj. opn., *ante,* at p. 309.) The majority then quotes various of the answers Young gave to the Board's questions as to what he was thinking when he was beating and strangling Harvey, and cites to a 2008 psychological evaluation of Young regarding his " 'at least average insight.' " (Maj. opn., *ante,* at p. 310.) It then states: "The Board ignored all of this evidence of petitioner's insights." (Maj. opn., *ante,* at p. 310.)

I could not disagree more. What the Board clearly did was weigh or balance what Young *did* say about why he did what he did, what he was thinking at the time, etc., with what he *could not or would not say* on those subjects—i.e., per the five examples given above. But, as our Supreme Court has made clear, it is *not* the responsibility of a court reviewing a writ petition regarding a Board denial of parole to reweigh the evidence and reverse the Board if *it* finds substantial evidence that the inmate now has insight. In discussing the insight issue, the court made exactly that clear: "It bears emphasis that while 'subjective analysis' is an inherent aspect of the parole suitability determination, *it plays a proper role only in the parole authority's determination.* [Citation.] The courts' function is one of objective review, limited to ensuring that the Board's or Governor's analysis of the public safety risk entailed in a grant of parole is based on a modicum of evidence,

not mere guesswork. [Citation.] It is the parole authority's duty to conduct an individualized inquiry into the inmate's suitability for parole. [Citation.] The courts consider only whether some evidence supports the ultimate conclusion that the inmate poses an unreasonable risk to public safety if released. [Citation.]" (*Shaputis II, supra*, 53 Cal.4th at p. 219, fn. omitted, italics added.)

To make this point crystal clear, in the very last sentence of the "DISCUS-SION" portion of its opinion, the court stated: "The court is not empowered to reweigh the evidence." (*Shaputis II, supra*, 53 Cal.4th at p. 221.) Although the majority recites this principle (see maj. opn., *ante*, at pp. 293, 304), I respectfully suggest it effectively disregards it by very clearly reweighing the evidence regarding Young's "lack of insight" (see, e.g., maj. opn., *ante*, fn. 17).

In sum because of the combination of a "modicum of evidence" (and, in my view, substantially more than that) regarding both (1) the egregiousness of the murder and (2) appellant's past and current "lack of insight" into the reasons he committed that murder and the circumstances surrounding it, I would deny the writ.