Filed 12/3/15  In re Riley CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re CHARLES RILEY,<br><br>on Habeas Corpus. | A145041<br><br>(Marin County<br>Super. Ct. No. SC181491A) |

Charles Riley, a life prisoner, appeals from the Governor's reversal of the decision the Board of Parole Hearing (Board) granting him a parole date.

Riley was in 1976 convicted of first degree murder of the parents of his then-girlfriend, Marlene Olive.  He was originally sentenced to death, but while his case was on appeal, the California Supreme Court declared the statutory death penalty scheme unconstitutional (*Rockwell v. Superior Court* (1976) 18 Cal.3d 420) and the Court of Appeal modified petitioner's sentence to 25 years to life on each count, said terms to run concurrently.  Riley's minimum eligible parole date was set at seven years, June 27, 1982.  He has now been incarcerated for more than 40 years.

Riley claims the Governor's reversal of the Board's grant of parole in 2014 is not supported by any evidence and an abuse of discretion. [1]  We agree and shall therefore

---

[1] The petition also claims that the Board's increase of the interval for parole consideration after a Governor's reversal from twelve months after the last Board hearing to 18 months was an arbitrary infringement of Riley's right to an annual parole consideration (because he was sentenced under the Indeterminate Sentence Law) that violated his federal and state constitutional rights to due process and to be free of ex post facto punishment.

vacate the Governor's decision, grant Riley's petition for writ of habeas corpus, and direct the Board to release Riley pursuant to the conditions set forth in its decision of September 19, 2014, granting him parole and setting a release date.

## BACKGROUND

### Riley's Pre-Incarceration History

Riley was raised in Marin County, in an intact family that was "stable and devoid of serious interfamilial conflicts, with no reported early emotional nor behavioral problems." His record indicated no delinquency or antisocial conduct as a juvenile. His first adult arrest was on March 26, 1975, when he and his girlfriend stole $1,114 worth of clothes from a department store, she directing him what to take. He was again arrested on May 14, 1975, for possession of a weapon and marijuana. The record does not reflect the disposition of these cases. Riley's next arrest, on July 1, 1975, was for the homicides.

Riley dropped out of high school during his senior year, with only a few units needed to graduate, then earned his high school diploma while in county jail. Prior to his incarceration, he had had several different jobs, including delivering newspapers, delivering pizza, bartending, and working in a circuit board factory.

### The Commitment Offenses[2]

"According to the Circumstances of Offense Report dated June 8, 1977, . . . Charles Riley (age 19), and his girlfriend, Marlene Olive (age 16) planned and executed the murder of Marlene's parents on June 21, 1975, in Marin County. Marlene Olive divulged to friends that her boyfriend, Charles Riley, hit her mother on the head with a hammer while she was sleeping in the sewing room of her home. She also stated that her father was shot in the back by Charles Riley. She admitted to wrapping up her parents'

---

We decline to address this issue because our ruling renders the issue moot. Moreover, the Board voluntarily agreed to advance Riley's parole hearing by three months.

[2] Our description of the commitment offense is taken from our officially unpublished May 2014 opinion reversing the 2011 decision of the Board denying Riley a parole date.

2

bodies in sheets and waiting until dark. Once it was dark, both she and Riley took the bodies to the fire pits at China Camp where the bodies were burned using wood and gasoline. During the trial, witnesses testified that Mr. Riley admitted to killing both victims. Apparently Mr. Riley and Marlene Olive were going to wait until the victims were pronounced dead, collect the insurance money, and go to Ecuador, South America."

The 1978 opinion of the Court of Appeal affirming Riley's conviction summarized his statement to the police at the time of his arrest: "Defendant and Marlene had been planning to murder the Olives for some time in order to prevent them from keeping him and Marlene apart; on the day of the killings (June 21) Marlene telephoned urging him to get his gun; it was prearranged that Marlene would lure her father from the house allowing defendant to enter and kill Mrs. Olive with a conveniently placed hammer; and then shoot Mr. Olive upon his return to the house; defendant obtained his gun (a .22 caliber revolver) and loaded it with bullets purchased for him by a friend; upon entering the sewing room, defendant bludgeoned the sleeping Mrs. Olive with the hammer (in a later confession to the jail nurse, defendant recounted his difficulty in dislodging the hammer and of the necessity to stab and suffocate Mrs. Olive because she continued to breathe); defendant then hid awaiting Mr. Olive's arrival; when Mr. Olive arrived and discovered the body of his wife, defendant shot him in the back; sometime later, the two of them tidied up the sewing room and rearranged certain furniture; later that evening, they placed the bodies (wrapped in sheets) in the Olives' automobile and drove to the firepits area where the bodies were doused with gasoline and set afire; defendant returned to the area on two occasions (later that night or early morning and again on June 23) and burned some of the unconsumed remains and other evidence; defendant stated he was 'high' on drugs when he committed the murders; defendant admitted discussing the killings with Deanna [a friend] on June 23." Riley also admitted cashing personal checks belonging to one of the victims several days after the killings.

As related in the court's opinion, at trial Riley repudiated his confessions, claiming he had initially admitted his guilt in order to protect Marlene. He denied any complicity in the murder of Mrs. Olive and claimed self-defense in the killing of Mr. Olive,

3

admitting only that he participated in the activities to conceal the crimes and dispose of the corpses, and in the theft and use of money taken from Mr. Olive's wallet. The court found Riley's testimony about shooting Mr. Olive in self defense "implausible" and noted that petitioner and Marlene had "strong motives" to commit the crimes, in "Marlene's frequently expressed hatred for her parents and [Riley's] anxiety to please her, the Olives' efforts to prevent Marlene from seeing [Riley], and the personal monetary gain through the death of her parents (Marlene was the sole beneficiary in her parents' will), intended to finance their trip to South America."[3]

Police reports from the investigation of the homicides include various indications of Marlene's expressions of desire to kill her parents. A letter to Riley, found in his home, read in part, " 'Of course I hope you'll wait till I'm 17 to marry me or kill my parents.' " Another letter to Riley found in Marlene's bedroom read, " 'If I could kill my parents, I wonder if Susan could come live with me.' " A third letter, found in Marlene's bedroom and dated January 1974, was addressed to " 'Mike,' " whom the police officer writing the report believed to be a former boyfriend of Marlene's, and read, " 'I was thinking about what you said, about that man who would take care of my Mom. I think we should talk it over, together. You and I. I'd be worried about what would happen after she died. But whatever did, wouldn't keep me away from you.' " The police reports include several statements from witnesses who heard Marlene express her desire and intention to kill her parents.[4]

---

[3] According to an article in the Los Angeles Times, Marlene was held in the custody of the California Youth Authority until she turned 21. Over the ensuing years, she was arrested many times on forgery and drug related charges and served time in jail. In 1992, she was arrested for possession of stolen credit cards, counterfeit identification and a forged check; police believed her to be one of the leaders of a ring of thieves and the main supplier of phony checks and credentials to the group.

[4] A 17-year-old boy told the officer that he had heard Marlene state on several different occasions that she would like to kill her mother and father. After a double date, Marlene's date told the witness that Marlene had "asked him to supply a bomb so that she could blow up her parents car." A girl who had been acquainted with Marlene for about one and a half years said that Marlene hated her parents, wished they were dead and often

4

A social evaluation by a correctional counselor at San Quentin Prison early in Riley's incarceration at San Quentin described him as a "very quiet, mild mannered, shy and withdrawn type of person, who never did have a lot of close friends but always craved for close interpersonal relationships with others. Quite probably he just never got beyond the immature and overly dependent pre-adolescent stage of emotional development." Riley exhibited "a low image of himself" and appeared to be "an inadequate type of person who is unable to cope with the demands of living in the complex and urbane society," "socially and emotionally isolated and quite unsophisticated." He "felt inferior due to his overweight condition and big stature" and his sense of " 'not belonging' " was exacerbated by the family's move to Arkansas for 16 months when he was in grade school, after which he was not able to resume contact with " 'the old crowd' " and began to associate with younger peers. He began to smoke marijuana just before starting seventh grade and found a sense of "status" in giving or selling drugs to high school students, as well as in his motorcycle. He did not date girls and had no girlfriend or sexual intercourse until he was 19 and met Marlene Olive. By his description of their relationship, he was "passive, insecure and greatly dependent upon" her and she took "the domineering, aggressive and influential role of leadership." She "sought him out for sex, not just daily but even more than once a day. He now reflects back and sees that she forced him to remain childlike, dependent upon her approval, wanting to always please her, while she could be 'the adult' and dominate his emotions and behavior. [¶] Reportedly, this 'love affair' had a very forcefully direct influence in motivating their decision and actions in committing these homicides."

The counselor noted that the "psychodynamics of the relationship of the Subject to his girlfriend/crime partner seems to be pivotal in evaluating this case," that "these homicides are not in keeping with his overall social background" and that "[h]is short-

talked about killing them, saying on different occasions that she was going to poison them, blow them up in their car and push them off a cliff in their car. She did not take Marlene seriously, including on an occasion when Marlene asked her to be an alibi witness "as Marlene was thinking about killing her parents."

5

lived criminal career does not suggest an underlying and basic antisocial/criminal mind or orientation. That Subject is guilty of these murders in undeniable. Also, that Subject is an inadequate person goes without question."

In a 1997 interview conducted as part of the evaluation for a parole consideration hearing, Riley maintained that when he arrived at the Olives' house, Marlene had already hit her mother on the head with the hammer, and that he shot Mr. Olive in self-defense when Mr. Olive attacked him after finding his wife's body, believing that Riley had killed her. Riley stated that after shooting Mr. Olive, he saw that Mrs. Olive was suffering and barely clinging to life, so he took a pillow and suffocated her. Riley insisted that the murders had not been planned for a long period of time, stating that Marlene talked to him about killing her parents, especially her mother, but this was "only mentioned in passing and he felt that it would never actually take place." This report noted, along with a number of aggravating factors relating to the offenses, that Riley was "induced by [Marlene] to commit the crime of murder. It appears that his girlfriend had a great deal of influence over him."

***Riley's Post-Incarceration History and Risk Assessments in 2011 and 2014***

Riley's life history and the most relevant psychological and risk assessments of him were subjected to Board scrutiny at the parole hearings in 2011, at which he was denied parole, and the 2014 hearing at which parole was granted.

The evaluations of Riley before the Board in 2011 indicated that while incarcerated, he earned a Bachelor of Science degree in Business Administration from Chapman College, his prison work reports were "mostly above average to exceptional," he had completed Vocational Drafting with "A+ grades," and his instructor stated he was employable in that field and had also completed training as a milling machine operator, a tool grinder operator and a lathe operator. Riley married twice while in prison: When he was 29 he married a woman he met through correspondence, but they divorced after a year. At age 31, he married a woman to whom he remained married for 10 years, when she died of breast cancer.

6

At the time of his 2011 parole hearing, Riley had incurred six rules violation reports (CDC [California Department of Corrections] 115s) during his 35-year incarceration, most recently in 1979.[5] He had been issued three Counseling Chronos (CDC 128As), reflecting "minor misconduct," most recently in 2003.[6]

The risk assessment prepared for the 2011 parole hearing stated that Riley's substance abuse as a teenager and young adult included marijuana, alcohol, hallucinogens, and cocaine, and that before he first used substances, he had been ostracized by his peers for not using. Riley believed his substance abuse began as a "surrender to peer pressure" and rebellion, especially against his father. He said his use of alcohol and drugs "probably played a role in his life offense in that he was 'not operating fully cognizant of everything[,]' " although he did not "blame the substances for his offenses" and took "full responsibility" for both his substance abuse and the offenses. He stopped using all hard drugs but used marijuana while incarcerated until the mid-1980s; he had not used any mind-altering substance since the 1980s and stated he would never again do so. Riley had participated in 12-step programs at various times throughout his incarceration and, most recently, had been an active member of Narcotics Anonymous (NA) from 2008 on. He stated he was committed to remaining clean and sober and liked " 'having clarity of mind.' "

---

[5] "Rules Violation Reports" document misconduct that "is believed to be a violation of law or is not minor in nature." (Cal. Code Regs., tit. 15, § 3312, subd. (a)(3).) The CDC 115s, dating from July 1977 to January 1979, were apparently for "fighting in '77, paraphernalia, telephone, contraband, behavioral expectations" and, most recently, "disobeying orders."

All further references to Regulations (Regs.) are to the California Code of Regulations, title 15 [Crime Prevention and Correction], division 2 [Board of Parole Hearings], section 2000 et seq.

[6] "Custodial Counseling Chronos" document "minor misconduct." (Regs., § 3312, subd. (a)(2).) Petitioner's chronos were for smoking inside a building (1994), unsanitary living quarters (2000), and "storing items in a prescription refill back other than prescribed medication." Riley believed this last incident involved him using a medication container to take coffee to work.

7

The 2011 Risk Assessment report stated that Riley has several medical conditions, including sleep apnea, benign prostatic hyperplasia and gastroesophageal reflux disease, and is considered "mobility impaired," using a cane and wearing orthopedic shoes.

The 2011 report summarized the conclusions of Riley's prior evaluations for the Board, commencing in 1982:

- In 1982, senior psychiatrist Sherman Butler reported that petitioner had "no mental disorder and that 'his violence potential at present appears no more than average.' " Senior psychiatrist Robert Brandmeyer agreed with Dr. Butler and also reported that petitioner appeared " 'somewhat insightful' and that he had made definite gains from the many Peer Counseling Programs in which he had participated."

- In 1985, after reevaluating petitioner, Dr. Brandmeyer again found no medical disorder and no more than an average risk of violence.

- In 1987, the psychiatric council for the "Diagnostic Unit" concluded that petitioner had "limited insight and evaded responsibility for his life crime," that testing indicated "narcissistic, antisocial, and histrionic personality traits, but no personality disorder," and that petitioner's testing was "favorable in terms of violence proneness." Petitioner was given a diagnosis of " 'Mixed Substance Abuse in Institutional Remission.' "

- In 1989, Dr. Butler reevaluated petitioner and found he was emotionally stable, he did not meet criteria for any psychiatric diagnosis, and his "violence potential outside of a controlled setting 'is estimated to be less than average.' "

- In 1990, psychologist Gary Elem agreed with earlier evaluations and recommended that petitioner " 'be given strong consideration for parole as soon as the Board of Prison Terms Panel finds it appropriate.' "

- In 1993, psychologist Ronald Hall found Riley was "candid," openly discussed his crimes, and took full responsibility and demonstrated remorse for his crimes. Dr. Hall diagnosed "Psychoactive Substance Abuse in Full

8

Remission" and concluded that Riley's " 'level of dangerousness is far less than that of the average inmate and that his progress for a positive re-entry into society is a positive transition.' "

- In 1995, psychologist Erich Rueschenberg found no mental illness and stated that in the community, Riley " 'should be able to hold on to his present gains if he is able to maintain positive relationships with his family members and remain drug-free.' "

- In 1997, psychologist L. W. Berning found Riley had no mental illness, had maintained a " 'productive level of programming for many years,' " and he " 'had made important gains in his maturity.' " Dr. Berning concluded that Riley's " 'potential for inflicting violence on members of the community would appear to be low, given the circumstances of the crime and his insignificant criminal history.' "

- In 2002, psychologist Joe Livingston reported that Riley's scores on assessment measures indicated a "low to moderate level of risk for future violence." He stated, " 'This outcome can be adjusted slightly downwards consequent to the dynamic factors which are largely protective from a risk of violence. Hence, the tests indicate a low risk of violence over the next ten years.' "

- In 2004, Dr. Livingston again reported a "low risk of future violence in the free community."

- In 2008, psychologist Richard Starrett evaluated Riley based on a review of the file, as he declined to participate in an evaluation interview. Dr. Starrett reported that Riley had no psychiatric diagnosis and "was deemed to be at low risk for future violence in the free community."

The Comprehensive Risk Assessment submitted to the 2011 Board panel by Dr. Katherine Twohy stated that Riley currently saw himself as a "very caring and giving person, as optimistic, and as a peacemaker," describing his greatest personal strengths as "being able to maintain an even keel, to stay focused, to avoid jumping to conclusions, to

9

be very forthright and honest, and to maintain his integrity," and his greatest weakness to be "his tendency to 'feel too much' sometimes—that is, to be overly sentimental." Asked what he had learned in prison, Riley stated, "I have learned to be independent. I don't succumb to peer pressure. Prison gave me a chance to step back and determine what I want to change. And, it gave me a chance to get an education."

At the time of the 2011 Board hearing, Riley's risk of violence was evaluated with two assessment guides, one used to estimate risk of future violence and the other to estimate general risk of recidivism.

On the first of these assessments, Riley's score placed him in the "very low" range as compared to other North American male offenders, in the first percentile. The "demonstrated factors" were related to his past, including his "historical need for stimulation and proneness to boredom, shallow affect, impulsivity, and irresponsibility."

On the second measure, Riley's score placed him in the "low" risk category. The "Historical" domain of this assessment indicated that he was 20 years old at the time of his first violence, and had a history of relationship instability and substance abuse problems; Dr. Twohy noted that, by definition, the historical data was "not amenable to significant positive change regardless of the number of years of his incarceration." In the "Clinical" or current domain, petitioner "displayed no predictive factors for recidivism."

In the "Management of Future Risk" domain, Dr. Twohy stated that Riley's plans for parole appeared feasible but needed to be backed up by current letters of support, that he might be overly optimistic about the ease of finding steady employment; that it appeared he would have support and assistance from family members and friends but would benefit from exploring other support resources; and that his participation in self-help groups in prison suggested he had the ability to seek out and participate in treatment activities in the community.

Finally, on the assessment of general risk of recidivism, Riley scored in the "low" range, at approximately the first percentile. The "endorsed" items on this measure were primarily related to historical factors including his offenses, infractions while

10

incarcerated and history of substance abuse. Dr. Twohy concluded that Riley's overall risk for violence in the free community was "low."

This conclusion was consistent with other evaluations in the historical record. In 1997, correctional counselor L.J. May stated, "[c]onsidering the commitment offense, prior minimal arrest history and excellent prison adjustment, I feel that [Riley] would pose a low to unpredictable degree of threat if released at this time. He has done an exceptional job in maintaining a positive attitude while inside a structured environment. . . . In the past nineteen years, I have supervised [him] as a Correctional Officer, a Program Supervisor and as a Correctional Sergeant. I feel that if there were such a thing as a 'model inmate,' [Riley] would have to be at the top of the list. His adjustment to life in CDC and his disciplinary free history speaks for itself. He maintains the same positive and courteous attitude that he has always kept." May reported that Riley's file did not indicate he had participated in any self-help programming or attended any substance abuse programming; he noted that Riley did not attend substance abuse groups "as it would conflict with his ongoing Church program," that he was the senior person in the Jewish Chapel and that he assisted with many fundraising projects and was involved in the 12-step program in the Jewish Chapel.

In a 2002 evaluation for a parole consideration hearing, correctional counselor J.D. Gerard stated, based on an interview and "approximately 10 to 12 years of casework and educational contact, that Riley would pose a "very low degree of threat" if released at that time. The evaluation noted that since the last hearing, Riley's "behavior has remained consistent, conforming and positive" and he received "exceptional and above average work grades." Gerard related that at the time of his offenses, Riley was "easily influenced and led by his crime partner and girlfriend, Marlene Olive," had "very low self-esteem" and negatively influenced by heavy drug use. Gerard stated, "He has somehow managed to maintain a positive attitude and outlook. He continues to seek self-knowledge and improvement through the Jewish Chaplain's Interfaith Twelve-Step program and process oriented Conflict Resolution group. His self-esteem and social

11

skills are good. [Riley] has learned to make good choices and follow through with them. He is thoughtful, considerate and well-liked by staff and inmates."

In a 2004 evaluation, Gerard again concluded, "Considering the commitment offense, prior minimal arrest history, and excellent prison adjustment, I believe [Riley] presents a very low degree of threat to the public if released from prison at this time. The crime occurred during a brief period of time during which [his] behavior was aberrant due to heavy drug use, low self-esteem, and bad influence of social peers." The evaluation noted that Riley had completed a nine week "Project Change Program," including "intensive substance abuse education," and that as a non-psychiatric inmate, Riley had "very limited access to therapy/self-help programs" but did "participate in what is available to him." This evaluation noted that Riley had completed "Computer Assisted Drafting" and was "employable in that field." Gerard felt Riley's plans were "sound and realistic. With his high level of education, strong work ethic, good work skills, and support of family, he should be able to obtain a sufficient living."

A 2008 laudatory chrono from Rabbi L.A. Moskowitz stated that he had known Riley for 10 years, during which time he had observed him "demonstrate positive and mature interpersonal skills when communicating with his peers, community volunteers and Correctional Chaplains. His exhibited ability to follow[] directions, exercise good judgment and displayed patience is inspirational to the inmates in the Jewish congregation. [Riley] and I have conversed in regards to his inappropriate behavior, which led up to his commitment offense. He genuinely expresses remorse for his behavior. I believe he understands the expectations of this institution, the Board of Parole Hearings, and society in order to receive a parole/release date. [Riley] is commended for his efforts to continue to gain insight into his life choices that resulted in his incarceration."

In 2011, Rabbi Moskowitz wrote to the Board in support of Riley's release, describing him as "an active and upstanding member of the Jewish community at CMC East. He attends Jewish services and religious programming regularly. He models the ideals of ethical monotheism. He is polite, courteous and willing to help others. He

12

serves as an upright example for other inmates to emulate." Rabbi Moskowitz stated that Riley was "involved in numerous programs of education, personal growth, behavior modification and pro-social behavior," having earned his degree in Business Administration from Chapman University, completed five CALPIA certificates at his workplace, regularly attended the Jewish 12-Steps programming and Jewish Committee for Personal Services/Gateways Hospital's one-on-one counseling, maintained active membership in good standing in the CMC's ILTAG Narcotics Anonymous group, completed the Alternative to Violence Program basic and advanced workshops, and regularly contributed funds to CMC's Jewish Chapel Stewardship account and other community fundraisers. The Rabbi concurred with assessments in Riley's file finding him to be at low risk for future violence in the free community.

With regard to plans for parole, Dr. Twohy's report related that Riley intended to live in Santa Rosa, where he had many family members and friends and would have the most support for his transition back into the community. He planned to live with or close to his mother, had a union contact in the Bay Area who would help him find employment, and planned to continue his involvement with NA and/or Alcoholics Anonymous (AA). Commenting that "[a]lleged sobriety in a controlled environment for an extended period of time is not synonymous with continued abstinence in the free community[,]" Dr. Twohy noted that a comprehensive relapse prevention plan would be "essential to facilitate optimal success in the community."

At the 2011 hearing, the Board received a letter from the Director of Partnership for Re-Entry Program (PREP) in Los Angeles, stating that the program supported Riley's release to live with his mother but, if the Board decided to release him to a more structured environment in Southern California, Riley was assured a room in one of PREP's transitional homes, as well as a position in the business the program sponsored, in which he would begin as a trainee and work up to a paid position. Riley told the Board that while he ultimately wanted to go to Northern California and his mother's home, he felt it would benefit him to have a "stopgap" between prison and home.

13

The Board received letters in support of Riley's release from his mother, nieces and some 17 family and personal friends, all emphasizing the maturity and responsibility he had gained over the years in prison and support he would have from family and friends if granted parole. The Marin County District Attorney's Office submitted a letter of opposition, as did the San Rafael Police Department. The latter urged denial of parole because " 'this incident shattered the San Rafael community, especially because the Olives were murdered in their home. San Rafael needs to remain a safe environment for existing and future families to thrive. A release of a criminal of this magnitude would destroy confidence in the criminal justice system.' "

In an interview prior to the 2011 hearing, Riley initially declined to discuss the crime, saying, " 'It won't make any difference. My memory is tainted. When I think about it, I think how unnecessary it was. Had I been stronger, had more backbone, the first time her hatred came up I should have gotten out. I just accept my responsibility for it—the nuances of who did what—I was there. I could have prevented this months earlier. I didn't because my relationship with my girlfriend was so important to me at that time. I had immersed myself in the marijuana subculture—don't be a snitch.' " Riley expressed concern that "whatever he said would sound like he was trying to blame others and not take responsibility for what he did. He reiterated that he takes full responsibility for the deaths of two people" and added, " 'I would do anything I could to undo what I did.' "

Asked at the 2011 parole hearing about how he became involved in the crimes, Riley said, "It began in disbelief. I did not believe that this was something that was going to—ever going to take place. And my desire to have this relationship was so, was overwhelming to me. And so, whatever when talk of this crime came about, I went along with it, and it grew from there. I was a sick kid. I mean, the way that I look at that what I was thinking, I was willing to do this because my relationship with her was more important to me than the consideration of other people's lives.' " He had never had a girlfriend before and " 'that's what I always wanted.' " Asked if he would have " 'done anything' " to keep the relationship, Riley said, " 'I think ultimately that's what I did. I

14

can look back on it now and see there's 100 points where I should have stopped and walked away from her and had, you know, gone to the authorities about it, to my family about it, to anybody, to her parents even. . . . At the time, I didn't feel that I could. The further along it went, the more trapped into the situation I felt and to the point where I did what I —I took, you know, their lives. And I would do anything to change that now, and not because of this moment.' "

Riley later elaborated, " 'I listened to her, what I thought at the time were angst with her issues with her family, and this agreeing with and going along with it. And when expressions of her desire to was primarily kill her mother, I just listened to it, yeah, I understand, but it was never something at the time that I believed would ever come to pass. And when it finally came to the point where the day of the crime took place, I felt trapped. And I can look at even that day, that moment, and realize that wasn't a trap, that I had decisions, and that it was my decision to go on and to participate in this crime.' " Riley did not in 2011 think he had a problem with "females bullying [him] around" and had "long since learned how to say no," observing that his deceased wife was "a very strong willed individual who had her opinions, . . . but we respected each other."

Riley felt substance abuse would "absolutely not" be an issue once he was out of prison: "[B]eyond the fact that I haven't done any drugs for more years than I can actually number, and I'm surrounded by people who use drugs on a daily basis and I have no desire to partake. I don't want—there is nothing, absolutely nothing going to—when the day comes that on the outside of this fence is going to put me back inside this fence. I'm going to do—I'm going out to live a moral life, a life that allows me to pay back those that stood behind me, and to try to enjoy the things that I threw away 36, 37 years ago. I didn't have a realization that they were out there. I can't let them down. The people that I've met, the staff that I've known over the years, some of them who were like father figures to me, I would never let them down." Asked what he would do if he had the urge to use drugs once released, where they were easier to get than in prison, Riley said he would talk to someone, specifically noting his relationships with his Rabbi, his friends, his mother, his nieces and the man who lived with his mother.

15

When asked how he began using drugs, Riley explained that he was trying to fit in with his peers: Everyone he knew and had grown up with was already smoking marijuana, he was "kind of an outcast" and, after a couple of specific triggering incidents, he decided he had to "join the crowd." Petitioner explained that he had been a "very heavy kid" and "kind of picked on and bullied most of [his] life," and found acceptance with his peers by joining the drug culture. He described his drug use as causing "some really incoherent thinking": "[Y]ou become more isolated and within the . . . drug culture, and us against them kind of thinking takes place when you're involved in that [¶] . . . [¶] . . . like they don't know what you're talking about, and why is everybody picking on me kind of '60s/'70s thinking that was going on." Marlene was part of this culture and they did drugs together. Riley said he thought his relationship with Marlene was good at the time but "I look at it now and see that it wasn't."

When the commissioner who presided at the 2011 hearing asked what he had done to address his drug use, Riley replied that in addition to "quitting many years ago," in 1979 he "started looking at [his] life and things that [he] wanted to change" and began following the "12-steps program." Riley said he was involved in the Jewish 12-step program rather than the prison program, and it covered "whatever your particular problem is, be it alcohol, or drugs, or emotional dependency." The program taught Riley "better ways of coping with things," that "there were people out there that I can go to and say, hey, I've got problem[s] here, you know, and get the help that I needed." He explained that he had stopped using drugs so long before starting the 12-step program that, for him, it was not about the drugs but "about having a social connection with people who are trying to better their lives, and that's what I've been trying to do since I've come to prison. I think it's given me additional tools." Riley said he now had "good self-esteem" because "I'm proud of what I do. I am proud of who I am. I'm not proud of what I've done. There are things—this crime is an example. I'm not proud of that, but I live to the best of my ability. I have an outstanding life. I take pride and integrity in being a decent person, helping people when I can. And those who know me appreciate me."

Asked what would prevent him from relapsing back into drug or alcohol abuse, Riley stated that "[b]eyond an extreme self-determination that this is never going to happen again," he had learned he could trust people when he had problems, such as to help him deal with his depression when he lost his father and his wife. He joined the 12-step program "to have a social connection that was beneficial to [him]"; he had been a member of the Jewish congregation for 25 years and intended to continue that; he had strong family ties and people ready to help him if he was released.

Addressing the Board at the conclusion of the 2011 hearing, Riley stated "I in no way want anybody to misconstrue what I've said as trying to shift blame on my co-defendant for my actions. I'm responsible and not the drugs, because it was my choice to use the drugs. They certainly contributed to making a bad decision. I'm the one that's responsible for James' and Naomi's lives. I could have done better. I should have done better. I knew better, but I did it. Now I've lived a life since that time, and I sincerely have tried to make amends and change for my actions, and what I did to the Olives in taking their lives. There is really—I can't do anything for them, and I wish above all else that's what I could do."

The 2011 Panel noted that at the conclusion of Riley's last parole hearing in 2008, the Panel said "no more 115s, 128s, learn a trade, continue with self-help, and they need positive chronos." It was noted that Riley had been free of disciplinary incidents, had earned a college degree, completed work in computer assisted drafting and the machine shop, worked in the PIA shoe factory, and was scheduled to begin work in the print plant. Regarding self-help, he had participated in the "CADX program" and many peer counseling programs, had been an active member of NA since 2008 and attended religious services on Saturday mornings.

Notwithstanding these achievements, the 2011 Board panel denied Riley a parole release date on the grounds he had not sufficiently explored and addressed the reasons he committed his offenses and his substance abuse at that time.

17

*Our Reversal of the Board's 2011 Denial of Parole*

On May 22, 2014, we reversed the Board's 2011 ruling. As we explained, Riley's consistent explanations of why he committed his offenses had for decades repeatedly been deemed credible and consistent with other evidence by virtually all of the psychologists and others who had evaluated Riley. The Board's finding Riley was unsuitable for release "rested solely upon circumstances that, if supported by the evidence at all, were not linked by any reasonable theory to a determination of current dangerousness." The record in 2011 provided no evidence Riley's "current mental attitude establishes that despite his excellent and long-standing intervening conduct, he would still pose an unwarranted risk to public safety if released." (*In re Denham* (2012) 211 Cal.App.4th 702, 715.) In addition to the absence of evidence Riley was currently dangerous, we questioned the Board's indifference to extensive evidence that, measured by the regulatory factors pertaining to suitability and unsuitability for release on parole (see Regs., § 2402), Riley appeared suitable for release; a conclusion additionally supported by the unique set of circumstances in which he committed his crimes. As we said, his horrific crimes "were a one-time occurrence, neither preceded nor followed by any evidence of [him][having a violent nature."

We also rejected the Board's theory that Riley's insufficient understanding of his substance abuse at the time he committed his offenses provided evidence of current dangerousness. As noted in our opinion, "given petitioner's extremely long period of abstinence, and determination to continue with NA and seek help from his network support in the event he was drawn to consider using drugs or alcohol, it is difficult to imagine what more he could have done to address this concern." We also cited the observation in *In re Stoneroad* (2013) 215 Cal.App.4th 596 (*Stoneroad*) that " '[t]he risk a former drug or alcohol abuser will relapse, which can never be entirely eliminated, cannot of itself warrant the denial of parole, because if it did the mere fact [the] inmate was a former substance abuser would "eternally provide adequate support for a decision that [he] is unsuitable for parole." ' " (*Id*. at p. 625, quoting *In Re Morganti* (2012) 204 Cal.App.4th 904, 921.)

18

Finally, we emphasized that the circumstances of Riley's life crime were so unique that it is difficult to see any nexus between his 30-year-old substance abuse as a teenager and young adult and current dangerousness to the public.

***The 2014 Board Proceedings***

The parole hearing conducted after our reversal took place on September 19, 2014, focused on activities that took place after the 2011 hearing. At the outset, Riley's counsel offered and the Board received numerous documents recapitulating the pre- and postincarceration history explored at the 2011 hearing, the many letters the Board received in Riley's behalf, as well as Riley's written "Statement of Insight Into and Impact of My Crime," which included his relapse prevention plan and a letter of remorse Riley had written to the family of his victims and others. The panel also had before it a new "Life Prisoner Evaluation Report" on Riley.

The supplemental evaluation reported that since the last hearing Riley had been transferred to San Quentin Prison as a Level II prisoner after reduction of his classification points from 28 to 19, the lowest classification in which a life prisoner may be placed. Riley had remained disciplinary free, continued to obtain above-average to exceptional work performance reviews, had engaged in a range of self-help programming and therapy, enjoyed strong support from staff, his family, and others in the community, and also remained productively engaged in vocational training.

One of the first subjects the Board panel addressed at the 2014 hearing was Riley's five-page "Statement of Insight Into and Impact of My Crime," which was directed to the four issues the Board had in 2011 asked him to think about and address at his next parole hearing "in terms of how they impacted [Riley's] behavior and served as motives for [his] actions/crimes: 1) Relationships; 2) Sex; 3) Money; and 4) Anger."

Riley's statement started off by emphasizing that his relationship with Marlene, and the sex that "was a key part" of that relationship, were key factors motivating his criminal acts. Riley states that at the time of the offenses "I felt like a social and emotional misfit and inferior to others. I lacked the kind of self-confidence and self-esteem that led to healthy relationships; as a result, I had very few friends and felt

19

isolated.  I gained social status by becoming a drug dealer and also giving away drugs and doing other favors for the peers I began to gather around me.  In turn I valued their friendship, including Marlene's, who soon became my main companion."  Riley agreed with the view of a correctional counselor that "my 'sexual development and boy-girl interpersonal relationships was [*sic*] naïve, immature and retarded.' "  Riley agreed sex was a motive, stating that his world had "certainly flipped over for me, a 19-20 year old in my first intimate sexual relationship—finally.  Sex was the 'E' ticket to life, love and reason for being.  I was eager, willing and sometimes fearful for her attention/affection to continue."  Riley understood that his deep need to continue this "love affair" played a significant part in his homicidal acts.  Riley also stated that "[e]ven now, looking forward to release, I'm not looking to pursue a sexual relationship.  Because I know how much my crime had to do with my relationship with Marlene, I would be very careful of any relationship I developed at this point with another woman. Most importantly, if any relationship went sour, I would simply walk away.  I would not fear rejection or loss."  Riley noted that he did have a "short-lived" marriage while in prison with a woman he met through correspondence, but "adjusted to that loss in a way I was unable to consider with Marlene at the time of the crime."  He also noted that he "married again at age thirty-four and over the decade my wife and I were married I grew close to her and her children.  That was a positive relationship until the end, when she got breast cancer and died.  That was a very difficult time for me as well, since I was locked up and could not be there for her."

Riley acknowledged that repressed anger also played a role in his conduct. "[U]ntil the time of the crime," he stated, "anger was always directed in on myself. Anger was something I could not, would not express toward others" and instead "repressed."  "I think I took all of that anger and self-loathing and rolled it up with all the anger and hostility that Marlene expressed about her parents to me.  Their grounding of her and restrictions they put on her seeing me only added fuel to the fire, as they became obstacles to our relationship—which was the only thing that mattered to me at that point. Marlene's feelings for her parents, particularly her mother, grew more hateful and filled

20

with anger. I listened, nodded, and agreed—taking on some of her anger as my own. Then came June 21st when Marlene told me that she was to be sent away and if I wanted her I had to get a gun. My deepest fear was to lose Marlene and I knew I would if she was sent away. That desperation became the anger that I turned on her parents."

Riley did not think his crimes were primarily motivated by money, as "I would have followed her penniless to Mexico or some other poor country without any prospects at all—all she had to say was the word." But he acknowledged that money was part of the fantasy he mindlessly indulged. One of the recurring dreams and plans he and Marlene had was "the idea of Marlene acquiring the family estate/life insurance" and moving to South America. "Certainly my motive/purpose that terrible day included the talk about Marlene coming into the estate and us living happily ever after on the proceeds." Adding "one last fact," Riley admitted that "I did cash/deposit a check for $50 that Marlene wrote on her parents' account in order to go to San Francisco, without care or concern that we could do so only because they were dead and reduced to ashes at our hands."

The last two pages of Riley's statement describe the impact of his crimes, not just on James and Naomi Olive, whose lives were taken as a result of his "horrible senselessness," but also the many members of their family and their numerous friends and neighbors, "so many that I can not list them all even if I knew each and every person by name—they are all victims of my thoughtlessness." Riley ends his long statement by declaring that "[n]othing I can ever do will remove/alter the impact my decision so long ago had on so many others. Yet there is nothing I could ever want to change more. I have spent and will continue to spend my life attempting to make up for what I did to so many so long ago."

Asked at the hearing whether there was anything further he would like to add to his written statement or emphasize, Riley said only that he was "fully and completely responsible" for his criminal acts.

After reviewing with Riley his "Statement of Insight Into and Impact of My Crime," the 2014 Board turned to the "Subsequent Risk Assessment" of Riley prepared

21

by Dr. Michael L. Venard, which updated the "Comprehensive Risk Assessment" prepared by Dr. Katherine Twohy for consideration at Riley's 2011 parole hearing. At the hearing the presiding commissioner read the concluding portion of Dr. Venard's risk assessment aloud, apparently in order to underscore the significance she attached to it, and enable Riley to "clarify" whether the statements attributed to him by Dr. Venard accurately represent his present view.

After noting Dr. Twohy's opinion that Riley "posed a low risk of violence in the free community," Dr. Venard's concluding statements are as follows: "Mr. Riley's explanation of the factors shaping his involvement includes a self-reported awareness of the trivial nature of his past reasoning. He said that issue alone causes him additional turmoil as he contemplates the magnitude of his actions against the minimal provocation. His expressions of remorse for the victims do appear credible and his account of the life crimes is generally consistent with the available documentation. Within that context, it is noteworthy that he has routinely been described as a man who did not exhibit sustained antisocial character traits or psychopathic tendencies when he was last in the free community. He has no recent history of impulsivity and as noted above, he has upgraded his community-ready vocational and academic skills. He has established a less conventional, albeit prosocially-motivated relapse prevention plan using religiously shaped goals and values. If support letters are received as anticipated, he does appear to have adequate community support. In sum these positive factors do appear to reflect prosocial emotional growth and contribute toward a mitigated probability of future violence in the free community relative to the most recent Comprehensive Risk Assessment. [¶] This inmate participated in a murder he described as 'brutal.'. . . This history aside, he has demonstrated the prosocial changes noted above and in light of what is noted/documented, it is this writer's opinion that there are no current factors of relevance aggravating his risk of violence in the free community."

During the course of the 2014 hearing, Presiding Commissioner Montes engaged Riley in a lengthy colloquy regarding his ability to develop healthier relationships than the one he had with Marlene, which Commissioner Montes considered "really the core

22

issue." In response, Riley explained that he was "no longer looking for a relationship to establish who I am." Though "not looking for a relationship at this time even upon release," Riley said he was confident that should one develop he would handle it much more maturely than he did when he was 20. As a result of "spending a great deal of time working on relationships," the marital, family, and other healthy personal relationships he developed and maintained while in prison, and the assistance he received from programs that helped him overcome difficulties coping with others as a youth, Riley saw no danger he would again fall into an unhealthy relationship comparable to that with Marlene. Riley was confident he now had the ability to walk away from an unhealthy relationship, whereas "[w]hen I was 20 years old I was unable to walk away from anybody."

Apparently because they related to Riley's insight into his offenses, which the Board considered a crucial question, the presiding commissioner felt statements attributed to Riley in the Life Prisoner Evaluation Report deserved to be read aloud, so Riley could "clarify" whether they accurately describe his present view. The portion read aloud quotes Riley as stating "I was shy, clumsy, and inexperienced with women prior to Marlene. I was a virgin. I fell for her completely lock, stock, and barrel into her world. I carried out these acts out of desperation driven by my selfish needs, specifically my need to be with and please Marlene in this regard of the terrible consequences for my action toward Mr. and Mrs. Olive, their families, or the community. Further exacerbating the horridness of our crime, we desecrated their bodies by cremating their remains as part of our ever growing efforts to cover up our terrible crimes. My thinking was confused and distorted. I was in complete denial that I delu[d]ed myself into acting as if this murder never happened, all a terrible nightmare to wake up from in the morning. To my core I am truly sorry and deeply ashamed for what I did, decisions I made the murder of the Olive's. I completely and utterly condemn that conduct for which there is no excuse or justification. I take responsibility for these crimes and have taken responsibility for addressing these flaws in my character to change myself to mature."

23

When asked to identify the "character flaws" he referred to, which led to his criminal acts, Riley said: "my neediness, my inability to deal with conflict," and "my inability to deal with abandonment issues."[7]

Later in the hearing, turning to Riley's positive institutional history, Deputy Commissioner Mahoney noted that during his many years in prison Riley had "worked and developed a more secure sense of using religiously-motivated goals in ways of thinking about yourself . . . developed more clearly defined sense of your own self-image . . . [is] no longer influenced by the demands of others." As he stated, "[y]ou're not dependent on others for validation, instead you've learned to hear and consider the motivation of [others]. You've established a behavioral pattern of motivational success." Commissioner Mahoney also noted that for decades virtually all of the psychological assessments of Riley concluded he "was a low risk for violence in the free community" and "again within the low range of general recidivism risk." Additionally, Riley's present parole plans "were feasible," he had presented a satisfactory relapse prevention plan, he had acquired "multiple [vocational] skills, and had "very support[ive] family, neighbor, and friends."

Commissioner Mahoney also thought Riley's "account of the life crime is generally consistent with the available documentation. Within that context it's noteworthy you've routinely been described as a man who did not exhibit sustained antisocial character traits or psychopathic tendencies when in the free community [and] [n]o recent history of impulsivity." Commissioner Mahoney concluded his opinion of Riley by telling him: "You continue to grow. You continue to reflect prosocial and emotional growth and contribute toward a mitigated probability of future violence in the free community." In support of this conclusion, the commissioner quoted the last sentence in a recent psychological evaluation of Riley: "In this writer's opinion there are no current factors relevant to aggravating your future risk of violence in the free

---

[7] At the 2014 hearing, Riley described being separated from his parents and lost for a day when he was 9 years old, and stated that the fear of this happening again was a recurring issue in his life that he thought of as a "character flaw."

24

community," which Mahoney considered "about as good a Psych and Risk Assessment as I've seen."

At the closing of the hearing, the presiding commissioner asked Riley if he had anything to add. After acknowledging that though his goal at the hearing "is to be found suitable," Riley observed that "at no time now or in the future have I forgotten the Olives and what that means . . . [a]nd because of what I did, I understand the concerns." He then made the following statement:

"[R]egardless of the outcome today . . . I am going to continue to strive to be better. That is what I wake up to do . . . each and every day. I'm not always successful. I'm not always better than the day before, but . . . that is what I try to do. I haven't blamed drugs as a causative factor because I did not want yet another thing where it looks like I am shifting blame for my actions for what I did to the Olives or something else. And if in fact it seems that I am trying to mitigate myself with Marlene, that is truly not the case. I accept the fact that I did these things and I regret them with every ounce of my 300 pounds. I can only assure you that you, the counties, the law, nobody will ever have anything to fear from me because I carry the weight of responsibility of two lives being out. I cannot bear anything else to ever happen again. I hope that I've done enough and know that I won't stop trying."

After closing arguments to the panel by a Marin County deputy district attorney and counsel for Riley, the Board recessed to deliberate. After returning to the hearing room, the presiding commissioner announced that, despite the gravity of his commitment offenses, which he committed 39 years ago, Riley no longer posed a risk to the public and therefore deserved a parole date.

Presiding Commissioner Montes identified the specific circumstances indicating Riley was suitable for release: He "did not have a history of violent crime prior to the life crime, as a juvenile or an adult," he "grew up in a stable home environment," had only six minor disciplinary violations, and none during the last 35 years, received numerous "laudatory chronos," had "managed to abstain from alcohol and drugs," continuously participated in NA, and numerous other self-help workshops and in charitable activities,

25

and has "not demonstrated any signs of mental illness while in prison. All of these factors, the presiding commissioner said, "are positive factors suggesting that you do have an interest and a commitment to prosocial conduct."

The presiding commissioner emphasized that the Comprehensive Risk Assessments in 2011, the supplemental risk assessment in 2014, and indeed every risk assessment of Riley since 1997, all indicated a low risk of violence. "[O]f particular note," the presiding commissioner said, "was the very low finding in the clinical construct for psychopathy, which someone with this egregious life crime we would be very concerned about . . . . So all of that is favorable."

After specifying Riley's postconviction and other credits, the Board ordered Riley placed in transitional housing in Alameda County, directed that he participate in a specified parole program, abstain from alcohol and any controlled substances, and be subject to drug testing.

### The Governor's Reversal of the Board's Grant of Parole

On February 6, 2015, finding that "the evidence shows that he currently poses an unreasonable danger to society if released from prison, the Governor reversed the decision to parole Riley.

The Governor's decision is based on the gravity of Riley's "utterly callous and heinous" crime and the proposition that "even after nearly 40 years, Mr. Riley continues to downplay his active role in planning and carrying out these murders." The Governor's justification of the conclusion that Riley still downplays his responsibility is as follows:

"[Riley] told the psychologist in 2014 that although he and Marlene had discussed killing her parents on prior occasions, 'he did not take her discussions seriously . . . assuming she was simply "venting." ' He said that on the night of the murders he went to Marlene's home to meet Marlene, and only realized that he was expected to carry out the murders when he saw Ms. Olive sleeping. He also claimed that he expected to sneak out of the house after killing Ms. Olive, and only shot Mr. Olive because Mr. Olive turned and saw him. He told the Board that the murders were 'an impulsive act' carried out after plans made the same day. Mr. Riley continues to paint himself as a bystander caught in

26

the grip of romantic infatuation. This is simply not the case. The Court of Appeal's 1978 opinion [which affirmed Riley's conviction] found that Mr. Riley and Marlene had been planning to murder the Olive's 'for some time' because the Olive's objected to their relationship. The two had 'prearranged' for Marlene to lure her father out of the house so that Mr. Riley could enter and kill Mrs. Olive with a 'conveniently placed hammer,' and then shoot Mr. Olive with a gun . . . brought to the house. Mr. Riley's actions were not impulsive; they were calculated and entirely without empathy."

The Governor's written decision appears to acknowledge that virtually all of the applicable regulatory factors indicative of suitability for release on parole apply to Riley[8] and, save the gravity of the commitment offenses, none of the factors indicative of unsuitability apply,[9] but found the relatively objective regulatory factors all "outweighed" by Riley's "minimization" of the calculated nature of the life offenses and his role in them and that until Riley "is able to come to terms with his role in this horrendous double murder," he will be unable "to avoid violent behavior if released." On this ground, the Governor reversed the Board's 2014 grant of parole.

---

[8] The regulatory factors tending to show suitability for release are (1) that the prisoner does not have a juvenile record of assaults or crimes with a potential of personal harm to victims, (2) that the prisoner "has experienced reasonably stable relationships with others," (3) that the prisoner has performed acts tending to indicate remorse or indicating he "understands the nature and magnitude of the offense," (4) that the prisoner committed the crime as a result of significant stress in his life, particularly stress built over a long period of time, (5) that the prisoner suffered from battered women's syndrome, (6) that the prisoner "lacks any significant history of violent crime," (7) that the prisoner's "present age reduces the probability of recidivism," (8) that the prisoner has made realistic plans for release or developed marketable skills that can be put to use upon release, and (9) "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d).)

[9] The other factors indicative of unsuitability for release are (2) that "the prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age," (3) that "the prisoner has a history of unstable or tumultuous relationships with others," (4) that the prisoner has previously committed sadistic sexual offenses, (5) that "the prisoner has a lengthy history of severe mental problems related to the offense," and (6) that "the prisoner has engaged in serious misconduct in prison or jail." (Regs., § 2402, subd. (c).)

## DISCUSSION

We review the Governor's decision under a " 'highly deferential "some evidence" standard.' " (*In re Young* (2012) 204 Cal.App.4th 288, 302 (*Young*), quoting *In re Shaputis* (2011) 53 Cal.4th 192, 221 (*Shaputis II*).) "[T]he appellate court must uphold the decision of the Board or the Governor 'unless it is arbitrary or procedurally flawed,' and it 'reviews the entire record to determine whether a modicum of evidence supports the parole suitability decision.' ([*Shaputis II*], at p. 221.) 'The reviewing court does not ask whether the inmate is currently dangerous. That question is reserved for the executive branch. Rather, the court considers whether there is a rational nexus between the evidence and the ultimate determination of current dangerousness. The court is not empowered to reweigh the evidence.' (*Ibid*.) At the same time . . . the Board's decision must ' "reflect[] due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards." ' ([*Id.*] at p. 210, quoting [*In re*] *Rosenkrantz* [(2002)] 29 Cal.4th [616,] 677, and citing [*In re*] *Lawrence* [(2008)] 44 Cal.4th [1181,] 1204 (*Lawrence*), and [*In re*] *Shaputis* [(2008)] 44 Cal.4th [1241,] 1260–1261 [(*Shaputis I*)].)" (*Stoneroad, supra,* 215 Cal.App.4th at p. 616.) We are required to affirm a denial of parole "unless the Board decision does not reflect due consideration of all relevant statutory and regulatory factors or is not supported by a modicum of evidence in the record rationally indicative of current dangerousness, not mere guesswork." (*Ibid.*)

The nexus to current dangerousness is critical. "*Lawrence* and *Shaputis I* 'clarified that in evaluating a parole-suitability determination by either the Board or the Governor, a reviewing court focuses upon "some evidence" supporting the core statutory determination that a prisoner remains a current threat to public safety—not merely "some evidence" supporting the Board's or the Governor's characterization of facts contained in the record.' ([*In re*] *Prather* [(2010)] 50 Cal.4th [238,] 251–252.)" (*Stoneroad, supra,* 215 Cal.App.4th at p. 615.) " 'It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; *the significant circumstance is how those factors interrelate* to support a conclusion of *current*

28

dangerousness to the public.' (*Lawrence, supra*, 44 Cal.4th at p. 1212, italics added.) The Board 'must determine whether a particular fact is probative of the central issue of *current* dangerousness when considered in light of the *full* record.' (*Prather*, . . . at p. 255, italics added.)" (*Young, supra,* 204 Cal.App.4th at p. 303.) " '[T]he proper articulation of the standard of review is whether there exists "some evidence" demonstrating that an inmate poses a current threat to public safety, rather than merely some evidence suggesting the existence of a statutory factor of unsuitability. (*Lawrence, supra*, 44 Cal.4th at p. 1191.)' (*Prather*, . . . at pp. 251–252.)" (*Shaputis II, supra,* 53 Cal.4th at p. 209.)[10]

The Governor's explanation for reversing the grant of parole focuses on Riley's statement to the Board that the murders were "an impulsive act' carried out after plans made the same day. From this statement, as well as language in the 1978 Court of Appeal opinion affirming Riley's conviction to the effect that Marlene and Riley had "prearranged" the crimes, the Governor reasons that Riley refuses to acknowledge that his "actions were not impulsive; they were calculated and entirely without empathy," and Riley "continues to paint himself as a bystander caught in the grip of romantic infatuation."

The Governor's decision is not supported by any record evidence rationally indicative of current dangerousness, and constitutes "guesswork." (*Shaputis II, supra,* 53 Cal.4th at p. 219.) Nor does the Governor's decision reflect due consideration of the regulatory factors indicative of suitability and unsuitability for release on parole, thus denying Riley the individualized consideration to which he is entitled. (*Id.* at p. 210; *In re Rosenkrantz, supra*, 29 Cal.4th at p. 677*; Lawrence, supra*, 44 Cal.4th at p. 1204; *Shaputis I*, *supra*, 44 Cal.4th at pp. 1260-1261.)

---

[10] The Board's regulations, described in footnotes 8 and 9, *ante*, set forth six circumstances tending to show unsuitability for parole and nine tending to show suitability, leaving the importance of these circumstances in a particular case to the judgment of the panel. (Regs., § 2402.)

Riley's putative characterization of the murders as an "impulsive act," which the Governor relies upon, was made in the course of a colloquy between the presiding commissioner and Riley regarding the meaning of Riley's written version of his offenses: "[O]n June 21, 1975[,] I went to the home of James and Naomi Olive, the parents of my then girlfriend, Marlene, and murdered them. They both died by my hand. Mrs. Olive died as a result of a brutal attack with a hammer, an attempted stabbing, ultimately to be smothered with a pillow. And I shot Mr. Olive at point-blank range with a pistol loaded that I had brought to their home. *These murders were carried out as a result of plans made that day by Marlene and I.* She had spoken with me and others many times in the months leading to this day about her hatred for her mother and her . . . desire and obsession with the idea of their death." (Italics added.)

Referring specifically to the italicized sentence, the presiding commissioner asked Riley whether "the life crime . . . was an impulsive act on your part or not.?" Riley's response, which the Governor does not fully relate, was: "*The day of the crime* it was an impulsive act." (Italics added.)

The full statement in which the italicized sentence appears, however, constitutes an accurate characterization of the "brutal attack," an admission by Riley of full personal responsibility, and an acknowledgment that, prior to the murders, he and Marlene had often spoken about the idea of her parents' death. It is apparent that Riley was saying the murders were "impulsive" only in that the specific plans were made that same day, but that the subject had been discussed often before. Riley's statement also clearly acknowledges his active role in the murders.

And this was far from the first time Riley has made such honest acknowledgements. As Riley admits, in his 1975 confession he protested "over and over again, 'she made me do it, she made me do it, she asked me to do it, she talked me into doing it.' " However, as noted in our opinion reversing the Board's 2011 denial of parole, as long ago as 1982, two "senior psychiatrists" found Riley was "somewhat insightful" and beginning to come to grips with his acts. By 1993, which is more than 20 years ago, a psychological evaluation found that Riley's insight had increased

30

enormously: at that time he "was 'candid,' openly discussed his crimes, and took full responsibility and demonstrated remorse for his crimes." The scores of psychological evaluations and risk assessment made of Riley during the last quarter of a century, many of which are summarized in our opinion reversing the Board's 2011 parole denial, declare that Riley presents a "low" or "very low" risk of violence, and all of those evaluations and assessments took personal responsibility and impulsivity into account.

So too did the Subsequent Risk Assessment most recently presented to the Board by Dr. Venard. As Venard stated, "Mr. Riley's explanation of the factors shaping his involvement includes a self-reported awareness of the trivial nature of his past reasoning. He said that issue alone causes him additional turmoil as he contemplates the magnitude of his actions against the minimal provocation. His expression of remorse for the victims do appear credible and his account of the life crimes is generally consistent with the available documentation."

The psychological evaluations of life prisoners "map the path of [an inmate's] rehabilitation." (*Lawrence, supra*, 44 Cal.4th at p. 1194.) While they certainly do not bind the parole authority, the rejection by the Board or Governor of consistent evaluations and assessments made by a multitude of trained experts for a period of two decades seems unreasonable and arbitrary.

But the psychological evaluations and risk assessments are not the only evidence contradicting the Governor's findings that Riley has "minimized" and "downplayed" his active role in the murders. Riley has himself repeatedly addressed the issue directly. Most recently, he stated at the 2011 hearing that there were "100 points" during his relationship with Marlene "where I should have stopped and walked away from her and had . . . gone to the authorities about it, to my family about it, to anybody, to her parents even. . . . [But] [t]he further along it went, the more trapped into the situation I felt." Looking back, Riley came to "realize that wasn't a trap, that I had [made] decisions, and it was my decision to go on and to participate in this crime."

We cannot affirm the Governor's decision because the premise of his conclusion—that Riley has failed "to come to terms with his role in the double murder"—is unsupported by any evidence.

There being no evidence in the record that Riley "continues to downplay his role in this crime," the Governor's decision cannot stand.

## DISPOSITION

The Governor's decision reversing the Board decision granting Riley parole is vacated. Riley's petition for habeas corpus is granted. The Board's grant of parole is reinstated and the Board is directed to conduct its usual proceedings for release on parole. (*In re Lira* (2014) 58 Cal.4th 573, 582.)

Considering that, according to the Board, Riley's adjusted base term (24 years), increased by aggravating factors and enhancements[11] and reduced by his total postconviction and pre-prison credits (12 years and 7 months), entitled him to a July 1, 1987, "release date," which was more than 28 years ago, this opinion shall in the interests of justice be final as to this court immediately. (Cal. Rules of Court, rule 8.387(b)(3)(A).)

---

[11] The base term for first degree murder at the time appellant was convicted was 15 years. The adjustments to the base term made by the Board were two years for the aggravated manner in which the life offense was committed and a seven-year enhancement for dual convictions.

 

                             _____

                             Kline, P.J.

We concur:


_____

Richman, J.


_____

Stewart, J.

*In re Riley on Habeas Corpus* (A145041)

33